MacCurdy, Appellant, *v*. Lindey et al.

Argued March 28, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*Lee C. McCandless,* with him *James E. Marshall,* of *Marshall & McCandless,* for appellant.

No one appeared or filed a brief for appellees.

OPINION BY MR. JUSTICE DREW, May 22, 1944:

Plaintiff, Orrin C. MacCurdy, instituted this proceeding in equity to restrain Louie H. Filer, one of de-

fendants, from selling and Joseph A. Lindey and wife, the other defendants, from purchasing the interests of said Louie H. Filer in a written contract granting the right to mine and remove certain minerals in and under plaintiff's land in Brady Township, Butler County; and also to have the contract declared to be null and void because of abandonment. From the final decree dismissing the bill of complaint, plaintiff has appealed.

Harry B. Grossman and Walter W. Grossman, together with their wives, owners in fee of the tract, containing about 107 acres, entered into this agreement on July 28, 1916, whereby they granted, bargained, leased and conveyed all the coal, limestone and iron ore in and under the property, together with all the rights incident to the mining and removing of the minerals from their land and that of others, for the constructing and maintaining of buildings and roads, and for the depositing of waste and refuse material thereon (without limitation of time), to the Sharon Coal and Limestone Company. The Grossmans, on January 1, 1927, conveyed the land, subject to the contract, to plaintiff, and later that year they also assigned to him all their right, title and interest in the contract. The Sharon Coal and Limestone Company, on September 29, 1917, transferred all its rights as grantee under the agreement to F. P. Filer. This grant, together with those procured by Filer from other owners in the vicinity, formed a tract of coal of approximately 1,000 acres. This tract as a whole was opened in 1917 as a going mine, with its mouth located on the premises adjoining that of plaintiff to the southeast. From the main entry, which was extended from the pit mouth northwardly and to the east of plaintiff's land, butt entries were opened to the right and left as the mining progressed. Annual advance payments, as required by the contract, were made to plaintiff's predecessors in title from 1918 to 1924. By December, 1924, the mine had been worked to the point where coal was being mined from under

plaintiff's land, through three butt entries extending to the left from the main entry. On account of a dip in the coal strata and the resultant dangerous condition of the roof near the boundary of plaintiff's property and that of the adjacent owner to the east, further butt entries into plaintiff's land from the east were rendered impossible, and the three already there were operated by means of expensive pumping equipment. Coal was continuously removed from under the land of plaintiff until some time in 1929, when such mining ceased and has since not been commenced. The mine tracks and equipment were removed thereafter from the butt entries west of the dip, but the pillars along such entries were left intact.

In 1931, Filer relinquished his interest in 700 acres of the 1,000-acre tract, because the coal therein had been removed or was no longer profitable to mine, but he retained the remaining block of 300 acres, including the coal under plaintiff's land. Also during that year the large tipple which had been built at the pit mouth was accidently destroyed by fire and it has not been replaced. Because the Western Allegheny Railroad ceased operation in 1934 on that part of its road serving the mine it could no longer be worked as a railroad mine, and the siding leading to the pit mouth was taken up. For the past ten years it has been operated as a local truck mine. No royalties have been paid to plaintiff or his predecessor in title since 1924; nor was house coal furnished, as provided by the agreement, after 1928.

Filer died on July 31, 1934, and by his will all his right, title and interest in the contract became vested in his widow, Louie H. Filer, one of defendants. On April 21, 1941, she entered into an agreement with the other defendants, Joseph A. Lindey and his wife (owners of other coal property to the south of plaintiff's land), for the sale of a tract of coal lands, including that of plaintiff. By the present proceeding plaintiff seeks to enjoin the execution of the provisions of this agreement

between defendants, and also to have declared null and void the right of Louie H. Filer, grantee by assignment, in the contract of 1916 between the Grossmans and the Sharon Coal and Limestone Company.

As to the matter of abandonment, the contract expressly provides: "This contract may be abandoned by second party [grantee] at any time hereafter, either by written notice to first party [grantors] of such abandonment, or if the contract is recorded, by a written abandonment and cancellation, duly executed by second party and recorded without any notice . . . It is further agreed, that said parties of the second part shall have the right to abandon this contract at any time if they shall determine that said coal is in quantity, quality or condition no longer mineable with economy and profit, and remove all machinery and other structures and property from said land; and in case of said action this agreement shall be null and void, and all payments are to cease, and no cause of action shall accrue to either party." While it is conceded by plaintiff that the grantee or its assignees never at any time gave the grantors or plaintiff any written notice of abandonment, nor filed of record a written abandonment or cancellation of this duly recorded contract, nevertheless he contends, inter alia, that since for twelve years no mining has been done under his land, no royalty paid to him, no house coal furnished and the mine tracks and equipment have been removed, there was in fact an abandonment of all rights acquired under the agreement.

This Court said, in *United Nat. Gas Co. v. James Bros. L. Co.*, 325 Pa. 469, 473, 191 A. 12: "Mere nonuser does not constitute abandonment; there must be an intention to abandon, together with 'external' acts by which such intention is carried into effect, ordinarily this raises a question of fact to be determined by a jury: *Llewellyn v. Phila. & Reading Coal & Iron Co.*, 308 Pa. 497, 501-2." Further, in this connection, it is stated in Barringer and Adams on The Law of Mines and Mining

in the United States, Vol. 2, p. 229: "Abandonment being a question of fact, its determination belongs to the jury and is to be reached by a consideration of the fact of the cessation of work and of the lessee's explanation thereof. If that cessation is unexplained and has lasted for an unreasonable time, a presumption of abandonment arises . . ." The record here shows that because of the dip in the coal strata on the easterly boundary of plaintiff's land, Filer determined that further removal of the coal beneath plaintiff's property was not profitable and was against the best mining practices. This for the reason that the dip resulted in the accumulation of water in the butt entries extended westwardly from the main entry, caused dangerous roof conditions in those entries and necessitated the constant use therein of costly pumping facilities. Because of the financial depression in 1929 and the desire to mine the coal west and north of this dip in a less dangerous and less expensive manner, Filer concluded to cease mining that portion of his tract under plaintiff's land temporarily until he could complete arrangements to work it from an opening on property to the south, where operations had theretofore been conducted by other persons, and which property Filer had acquired, but is now owned by defendants, Joseph Lindey and his wife. No ribs of coal were withdrawn from the butt entries under plaintiff's property after the cessation of operations, because it was Filer's intention to use such entries when mining was started through the entry to the south. While mining operations on other portions of the tract to the east of the strata dip have never ceased, they have been materially reduced by the burning of the tipple, the loss of railroad facilities and the death of Filer. The learned chancellor, after making these findings, concluded that the delay in removing the coal to the west of the dip was sufficiently explained to indicate no intent on the part of the grantee to abandon the rights acquired under the contract.

The findings of fact were approved by the court en banc and are supported by competent evidence and, therefore, we will not disturb them: *Hazleton v. Lehigh Val. C. Co.*, 339 Pa. 565, 16 A. 2d 23. And since we agree with the chancellor's conclusion, it is unnecessary for us to determine whether it was the parties' intention, in the execution of the contract of 1916, to effect a sale of the coal in place and to grant a complete title to it, and if so, whether abandonment could take place under the circumstances here presented. See *Arnold v. Cramer*, 41 Pa. Superior Ct. 8.

As to royalties and the furnishing of house coal, the contract provides: "Within one year from the date of this contract [the grantee shall] test said land by drilling or otherwise, and in case there should be discovered a mineable vein or basin of mineral of sufficient quantity and quality to justify the opening and mining of any of said minerals, in the opinion of said second parties [the grantor] then they agree to mine out said minerals, and pay the following rate for all minerals mined on said premises, to-wit: three cents for each ton of 2240 pounds of mine run coal; two cents for each ton of 2240 pounds of limestone or iron ore. It is agreed by the parties of the second part that they will, after the expiration of one year from the date, commence mining said minerals in good faith . . . and if such mining is not commenced at the expiration of said time, then second party shall thereafter pay . . . to said first party the sum of one hundred and seven dollars per year, as advance payments on royalty on the minerals to be thereafter first mined, and these yearly advance payments shall continue until mining is commenced as aforesaid, or until this contract is abandoned, and no longer, it being understood that the advance payments on royalty shall cease when mining is actually commenced, regardless of the output of the mines. Second party shall have the right to reimburse himself for all advance payments made by

retaining the rate per ton royalty to the amount of such advance payments, on the minerals first mined after mining is commenced . . . and further the parties of the first part is to have ten tons of coal each year at the pit's mouth as soon as they commence to mine coal from said land." The royalty on the coal mined from under plaintiff's property from 1924 to 1929 amounted to less than the advance payments made by grantee from 1918 to 1924 and therefore there are no royalties now due. There is nothing in the bill of complaint as to the violation of the provisions regarding the furnishing of house coal, and, therefore, that matter was not properly before the chancellor and need not be considered by us.

"Forfeiture is not a favorite of the law, and to permit a declaration thereof for breach of covenant, the right thereto must be distinctly reserved, the proof of the happening of the event upon which it is to be exercised must be clear, the right must be exercised promptly, and in equity the forfeiture must not be unconscionable": *Myers v. Ohio-Penn Gas & Oil Co.*, 294 Pa. 212, 220, 144 A. 93; *P.-O. Gas Co. v. Franks's Heirs*, 322 Pa. 233, 185 A. 280; *Old Furnace Coal Co. v. Wilson*, 332 Pa. 208, 3 A. 2d 336. In the contract which we are here called upon to consider there is no provision for forfeiture. Even if plaintiff had a right to a declaration of forfeiture the record here clearly shows that he did not attempt to exercise it promptly. In this connection the chancellor stated: "The notice from the plaintiff to Mrs. Filer, defendant, by letter dated May 7, 1941, was the first notice given by him of his intention to declare a forfeiture, although he had resided near the mine since 1927, had knowledge from his working in the mine as to the mine owners' difficulty in mining his coal and removing it through the existing shaft entry; of the abandonment by the Allegheny and Western Railroad of train service, reducing this mine from a railroad mine to a truck or team mine; of the burning of the tipple; of the death of Harry Filer, and of the surrender of the Filers to the

owners of coal land in this plot that had been worked out; and after he had knowledge that Mrs. Filer had or was about to make sale of plots of coal, including plaintiff's coal, to the Lindeys, who were operating a mine shaft in close proximity to plaintiff's coal and from which shaft the plaintiff's coal and the remainder of the block that was sold or about to be sold to the Lindeys could most expeditiously and profitably be mined." Moreover, to declare a forefeiture here would indeed work a loss to defendant, Mrs. Filer, and great expense and inconvenience to the other defendants, without any corresponding advantage to plaintiff and thus would be highly unconscionable. This for the reason, as stated by the chancellor, that: "The Lindeys can, perhaps, at large expense and cost to them, mine the coal purchased from Mrs. Filer surrounding plaintiff's coal without mining or removing plaintiff's coal. If that be done, no responsible coal operator would sink a shaft, build a tipple with the necessary appliance for the sole purpose of mining only the seventy or seventy-five acres of coal remaining under plaintiff's land. This would deny the plaintiff any income from his coal. It seems to us, that to decree as he prays would work only a monetary loss to the plaintiff and the only satisfaction he would have would be the knowledge that the coal still remained unmarketable in his land."

We are satisfied that the court below properly dismissed plaintiff's bill of complaint.

Decree affirmed.