GILBERTON CONTRACTING COM-PANY, Inc.,

v.

Kenneth O. HOOK, District Director of Internal Revenue

UNITED STATES of America

v.

The RHOADS CO., Inc.

UNITED STATES of America

v.

GILBERTON CONTRACTING CO., Inc., et al.

Civ. A. Nos. 25474, 26079, 27696.

United States District Court
E. D. Pennsylvania.

June 22, 1966.

**688**

John J. Curran, Pottsville, Pa., La Brum & Doak, Lewis Weinstock, Joseph G. Manta, Philadelphia, Pa., for Gilberton Contracting Co., Inc.

Drew J. T. O'Keefe, U. S. Atty., Sullivan Cistone, Asst. U. S. Atty., Philadelphia, Pa., David H. Hopkins, Jr., Attorney, Tax Division, Department of Justice, Washington, D. C., for District Director of Internal Revenue and United States of America.

Israel T. Klapper, George I. Puhak, Joseph J. Ustynoski, Hazleton, Pa., for Park Trent Coal Co., Inc.

Raymond L. Brennan, Harrisburg, Pa., for Rhoads Co., Inc.

## OPINION

KRAFT, District Judge.

The gravamen of these three actions is the disputed ownership of a large deposit of silt on the surface of a 65.9 acre tract of land in Mahanoy Township, Schuylkill County, Pennsylvania. The tract is presently owned by Gilberton Contracting Company, Inc. (Gilberton), which instituted its action (C.A. 25474) against the District Director of Internal Revenue to compel a release of certain Government tax liens affecting the land.

The tax liens arose from outstanding assessments made against The Rhoads Company, Inc. (Rhoads), and Park Trent Coal Company, Inc. (Park Trent) for sundry unpaid taxes due the United States under various statutes for the years 1947, 1952, 1954 and 1955.

The United States filed separate actions to reduce to judgment the respective tax liabilities of the defendants Rhoads (C.A. 26079) and Park Trent (C.A. 27696) and to resolve the controversies over ownership of the pile of silt upon which the Government claims valid liens.

The cases were consolidated for trial without jury and tried to our late, revered colleague, Judge Grim, whose untimely death intervened before a decision was rendered.

By order dated December 23, 1965, Chief Judge Clary re-assigned these actions for our disposition. After a conference with counsel on February 7, 1966, the parties through their respective attorneys, agreed that our adjudication should be made upon the record before Judge Grim, as supplemented by evidence adduced upon a further hearing

before us on April 12, 1966,[1] at which Park Trent alone offered additional evidence.

After careful review of this rather confused and unsatisfactory record, as supplemented, and full consideration of the oral argument, briefs and suggested findings of counsel, we make the following

### FINDINGS OF FACT

1. On June 1, 1951, Williamstown Collieries Company conveyed to Counties Coals, Inc. (Counties) the surface of a 65.9 acre tract of land situate in Mahanoy Township, Schuylkill County, Pennsylvania.

2. The deed was signed by H. R. Randall, (Randall) President of the corporate grantor. Randall and his son, D. V. Randall, were directors of the grantee, and the elder Randall's wife owned 30 of the 50 issued shares of Counties.

3. At a meeting of the Board of Directors of Counties held on June 1, 1951, a resolution was adopted which authorized the officers of Counties to execute a lease of the tract and a coal breaker, known as Park No. 3, to Rhoads for the processing of steam sizes of coal, for an initial term of ten years at a rental of $200 monthly. The coal breaker did not then exist, but its immediate construction by Rhoads, *sub nomine* Rhoads Contracting Company, was in contemplation.

4. Randall, who was also President of Rhoads, died before the trial of these actions, but his depositions were taken in May and June, 1963 for discovery purposes. Portions of his depositions were admitted in evidence at the trial on offer by the respective litigants.

5. In his depositions Randall testified that a written lease authorized by the resolution aforesaid was entered into between Counties and Rhoads, *but he did not produce the lease nor did he offer a reasonable explanation for its absence.* The alleged lease was never produced or offered at the trial by any of the parties nor was any copy. We find no written lease between Counties, as lessor, and Rhoads, as lessee, was executed.

6. On July 9, 1951, Rhoads, *sub nomine* Rhoads Contracting Company, borrowed $125,000 from the Hazleton National Bank for the purpose of constructing on the subject tract a wood and steel breaker for the processing of steam sizes of coal, identified as Park No. 3. It executed and delivered to the bank a collateral demand note for the amount of the loan, secured by its chattel mortgage on the coal breaker.

As additional collateral security for this loan, Counties, on the same date, also gave a mortgage to the bank, in like amount, upon the surface of the subject 65.9 acre tract. Both mortgages were recorded in Schuylkill County during July, 1951. No mention of accumulated silt is made in either instrument, since no silt was deposited on the land prior to the time of the loan by the bank to Rhoads for construction of the coal breaker.

7. However ill-defined may be the actual terms of any agreement between them, in light of the interlocking officers and directors of Rhoads and Counties, as well as of the informality of the dealings between the two corporations, Rhoads had implied permission, at least, from Counties to deposit on the land leased by

---

1. Rhoads did not participate in the trial before Judge Grim nor was it present or represented at the February 7 conference or the hearing on April 12, 1966. Raymond L. Brennan, Esq., record counsel for Rhoads, sought to withdraw his appearance by a letter dated March 24, 1966, to the Clerk of this Court, a copy of which we received. We advised Mr. Brennan by letter dated April 6, 1966, of the requirements of our local rule governing withdrawal of counsel. Thereafter, we received a copy of a letter dated April 15, 1966, from Mr. Brennan to David V. Randall, Esq., son of H. R. Randall, deceased president of Rhoads, suggesting that D. V. Randall assume control of the litigation on behalf of Rhoads, Mr. Brennan has filed no petition to withdraw his appearance nor was any appearance entered by Mr. David V. Randall. Mr. Brennan did appear at argument on May 20, 1966.

Rhoads from Counties, the silt, which was the waste product of Rhoads' operation of Park No. 3.

8. From the latter part of 1951 through most of 1954 Rhoads operated a fine coal plant, designated as Park No. 3, on the subject tract. A by-product of this operation was a fine waste material known as silt,[2] which was deposited on the premises by Rhoads.

Rhoads, through Randall, regarded the silt unsaleable during the years Rhoads operated the fine coal plant. Because of his conviction of the unmarketable character of the silt, Randall believed it was "advantageous" for Rhoads to utilize the silt to fill a large cavity in the land caused by earlier strip mining.

9. Rhoads intended to and did abandon all its right, title and interest in and to the accumulating silt, which resulted from its operation of Park No. 3, as, from day to day, the deposits thereof were made on Counties' land.

10. Counties became owner of the silt deposited by Rhoads on Counties' land as it was deposited from day to day, because of Rhoads intentional abandonment.

11. On September 2, 1954, Rhoads granted an option, in writing, to a Mrs. Joseph C. O'Malley and a Mrs. Michael J. O'Malley to purchase sundry rights and properties at various locations, which included the Park No. 3 plant. Significantly, a specific reservation was contained in this option reserving to Rhoads the right, for the life of the lease thereon, to 2000 tons of silt per week to another location, to wit, on the site of the Hazleton Lease. *No such reservation was made in the option of any of the silt on the Park No. 3 site, the silt involved in this case,* nor was any language employed which manifested any interest or right of Rhoads in this silt.

12. On November 29, 1954, Randall, as agent for Rhoads only, entered into a written lease with Joseph O'Malley, husband of one of the optionees, who acted, inter alia, as trustee for sundry participants in *three prospective* corporations, one of which was Park Trent, in purported accordance with the aforementioned option of September 2, 1954, *to sell* to the latter, for $190,000 net, sundry rights and properties of Rhoads at various locations including, inter alia, the fine coal plant known as Park No. 3, *and certain land surfaces of Continental Coal Co. and of Counties,* neither of which latter corporations were or were purported to be parties to this agreement.

Significantly again, Rhoads reserved rights to remove 2000 tons of silt per week under the Hazleton lease (a different site) and also reserved all cinder banks on the surface of the land, *but made no mention or reservation of the accumulated silt on Counties' land,* here in controversy.

To what extent the agreement to sell, dated November 29, 1954, was consummated by actual sales and conveyances does not appear, but Counties did not sell and convey to Park Trent or any other grantee the land on which the coal breaker, Park No. 3, was situate; nor did Counties sell or abandon to Park Trent the accumulated silt which Counties owned by reason of Rhoads abandonment thereof.

13. From December, 1954 until October 15, 1955, Park Trent operated the fine coal plant at the Park No. 3 site and deposited the silt emanating from its operation on top of the silt accumulation previously deposited by Rhoads.

14. Park Trent had knowledge and notice, when the agreement to sell, dated November 29, 1954, was executed, that Rhoads and Counties were separate corporations, and that title to the surface of the land was in Counties, subject to the bank's mortgage of record.

15. On January 21, 1955, Park Trent procured two fire insurance policies on

---

**2.** Also interchangeably referred to as culm by the parties, counsel and witnesses. Technically there is a difference between culm and silt, insofar as culm is the *coarse* waste emanating from heavy media coal plants. There were large culm banks, too, on Park No. 3, which are not involved in these actions.

the Park No. 3 fine coal plant, each in the amount of $25,000 with a mortgagee clause in favor of Hazleton National Bank.

16. Park Trent made various monthly payments to Rhoads during the period of approximately eleven months that Park Trent operated the Park No. 3 fine coal plant, leaving an unpaid balance due Rhoads of $140,476.06 as of September 30, 1955.

17. During the span of its operations Park Trent made daily analyses of the quality of the coal content of the waste being deposited by it on the silt bank of the Park No. 3 breaker. These tests revealed that the refuse being deposited was rich in coal content.

Park Trent made one sale of about 1000 tons of its silt to the New Jersey Zinc Company while Park Trent was in possession.

18. During the period of its occupancy of the land Park Trent did not exercise or attempt to exercise any dominion or rights of ownership over the silt earlier abandoned by Rhoads and then owned by Counties.

19. In August of 1955 financial difficulties began to affect the operations of Park Trent and it was obliged to default in its payments to Rhoads. It was unable to meet its payroll on October 15, 1955 and then ceased its operations and surrendered possession to Rhoads which did nothing to re-assert dominion or rights of ownership to the silt it had previously abandoned to Counties.

20. Shortly thereafter, Rhoads, in turn relinquished possession of the tract Park No. 3 and the breaker to Hazleton National Bank, which, upon default by Rhoads, foreclosed the collateral mortgage on the surface of the land given the bank by Counties.

A writ of fieri facias real estate, dated October 20, 1955, was issued pursuant to which the land was sold at Sheriff's sale to Hazleton National Bank on November 18, 1955.

The Sheriff's return of the writ discloses "nulla bona" as to personal property.

21. Prior to the foreclosure sale Randall advised Park Trent that the Hazleton Bank intended to foreclose its mortgage. Park Trent was not served with official notice of the sale. No one on behalf of Park Trent attended the sale.

22. Randall was present at the Sheriff's sale which was conducted by his then brother-in-law. Randall made no claim nor did he give or attempt to give notice of any claim of ownership or other interest of Rhoads in the Park No. 3 silt before, during or after the sale.

Rhoads never, by lawsuit or otherwise, attempted to assert any property right or interest in the silt following the sale.

23. By reason of Rhoads' default, the bank also took peaceful possession of the Park No. 3 breaker, which was the subject of the chattel mortgage given to the bank by Rhoads as collateral security for the latter's demand note. The bank, at the same time, took peaceful possession of the silt which had been abandoned by Rhoads to Counties and the silt deposited by Park Trent.

24. The Hazleton National Bank received a deed to the surface of the land from the Sheriff dated November 18, 1955. This deed contained no mention of the silt bank involved herein.

25. Counties intended to and did abandon to the bank, in November, 1955, the silt which Counties owned by reason of Rhoads' abandonment.

26. More than a year after foreclosure and possession, the bank, on December 11, 1956, conveyed the same premises to Gilberton for $30,000. Before delivery of the deed to Gilberton the following clause was included in the instrument:

"TOGETHER with all culm banks, railroad sidings, cleaning plant and all other structures, buildings and improvements of any kind or nature whatsoever."

27. The bank, in 1956, manifested its intention to and did appropriate and exercise dominion and rights of ownership of the silt in its possession which had previously been abandoned by Rhoads to Counties, as well as of the silt deposited by Park Trent which had not been abandoned.

28. During the month of January, 1957, following the conveyance of the premises, Gilberton denied Park Trent the right to remove any of the silt from the land.

Counsel for Park Trent then advised the solicitor for the bank, by letter dated January 23, 1957, of the unsuccessful efforts of Park Trent to remove silt which Park Trent claimed, and requested the assistance of the bank in obtaining from Gilberton, information concerning any documents upon which Gilberton based its claim to the silt.

29. Park Trent never intended to and did not abandon the silt it deposited during its occupancy and operation of Park No. 3 and is still owner of that silt.

30. The bank, in 1956 and prior to its conveyance to Gilberton, acquired, by appropriation, ownership of the silt of Counties which Counties abandoned to the bank. Gilberton now owns that silt as the bank's grantee-assignee.

31. The bank never acquired ownership of the silt deposited by Park Trent.

32. Neither Rhoads nor Park Trent paid or offered to pay the bank or Gilberton for the use of the land occupied by the silt deposited at any time after the bank's foreclosure or the conveyance of the tract to Gilberton.

33. Before the sale to Gilberton, Randall had advised the bank to make a deal for the silt when it sold the land. The bank previously had attempted, unsuccessfully, to sell the silt to the Pennsylvania Power and Light Company before it executed the deed to Gilberton, but the Pennsylvania Power and Light Company declined because it believed the silt to be of little or no value.

34. The District Director of Internal Revenue made assessments of withholding taxes, taxes imposed under the Federal Insurance Contributions Act, taxes imposed under the Federal Unemployment Tax Act, income and excess profits taxes against the defendant, Rhoads, the total amount of which, now owing, is $204,917.07 plus interest.

| Kind of Tax | Period | Tax and Int. | Date Assess. | Notice and Demand | Notice of Lien |
|---|---|---|---|---|---|
| WH FICA | 4th Qtr. 1952 | * 18,035.74 | 3–16–53 | 4–9–53 | 12–24–53 |
| WH FICA | 3rd Qtr. 1954 | 8,841.01 | 11–15–54 | 2–17–54 | 6–15–55 |
| WH FICA | 4th Qtr. 1954 | 4,377.17 | 2–15–55 | 3–15–55 | 6–15–55 |
| Income & Ex. Profits | 1947 | **181,144.05 | 2–28–57 | 3–7–57 | 4–27–57 |
| FUTA | 1954 | 3,643.18 | 2–23–55 | 3–8–55 | 8–31–55 |

* On 3–16–53 a part payment of $1,124.08 was made against the tax liabilities assessed for the fourth quarter-year period of 1952.

** On 11–22–60 a part payment of $10,000 was made on the income tax liability for Rhoads for the year 1947.

35. The District Director of Internal Revenue made assessments of withholding taxes and taxes imposed under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act for the year 1955 against the defendant, Park Trent, the total amount of which, now owing, is $36,345.80 plus interest.

| Kind of Tax | Period | Tax Penalty & Interest | Assessed | Notice and Demand | Notice of Lien |
|---|---|---|---|---|---|
| WH FICA | 1st Qtr. 1955 | $ 2,819.37 | 5–23–55 | 6–15–55 | 11–23–55 |
| WH FICA | 2nd Qtr. 1955 | 13,125.10 | 8–23–55 | 8–29–55 | 11–23–55 |
| WH FICA | 3rd Qtr. 1955 | 13,735.71 | 11–30–55 | 12–7–55 | 1–18–56 |
| WH FICA | 4th Qtr. 1955 | 44.23 | 2–23–56 | 3–1–56 | 5–18–56 |
| FUTA | 1955 Add. | 707.32 | 2–29–56 | 3–7–56 | 5–18–56 |
| FUTA | 1955 | 6,714.07 | 1–31–57 | 2–7–56 | 1–21–59 |

On October 4, 1955, a partial payment of $800 was made against the taxes assessed for the first quarter-year period of 1955.

36. The unchallenged accounts of assessments by the Government are correct.

37. The Tax Court of the United States in Rhoads Company, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 54326 entered an adjudication that Rhoads was deficient in its income tax for the taxable year 1947 in the amount of $116,819.52.

38. On October 13, 1958, the Government seized the silt bank on the Park No. 3 site, upon land then and now owned by Gilberton, for non-payment of taxes owed by Rhoads and Park Trent.

39. The actual quantity and the total and unit fair market value of the silt have not been established and are unknown. Visual bulk estimates ranged from 250,-000 to 600,000 tons and valuations from 20 cents a ton in place to $2.00 a ton after processing. The totals deposited by Rhoads and Park Trent, respectively, have not been established.

DISCUSSION

Gilberton's claim to the whole of the silt deposit depends, we think, on whether Rhoads and/or Park Trent abandoned whatever ownership rights each had in the waste material.

The well established law of Pennsylvania is that culm or refuse severed from its original place is personal property, Gilberton Coal Co. v. Schuster, 403 Pa. 226, 229, 169 A.2d 44 (1961), which may be abandoned when deposited on the land of another with the intention of abandoning it. Fidelity Philadelphia Trust Co. v. Lehigh Valley Coal Co., 294 Pa. 47, 67, 143 A. 474 (1928). "When considering the question of abandonment, the nature of the property, and the conduct of the one who claims it, must be given due weight." Llewellyn, et al., v. Philadelphia & Reading C. & I. Co., 308 Pa. 497, 502, 162 A. 429, 430 (1932). The intention to abandon must coalesce with external acts giving effect to such intention, which generally presents a question of fact for the factfinder. United National Gas Co. v. James Brothers, 325 Pa. 469, 473, 191 A.

12 (1937). Mere non-user of the property does not constitute abandonment. MacCurdy v. Lindey et al., 349 Pa. 655, 658, 37 A.2d 514 (1944).

When Rhoads began operation of the Park No. 3 coal plant sometime after July 9, 1951 on Counties' land, it was primarily interested in producing fine coal. A problem incident to this production was the storage or disposal of the effluent waste material remaining after the coal was processed. The waste material, known as silt, was considered unmarketable by Rhoads during the entire period of its operations. For this reason it was dumped as fill, into a large depression in the ground caused by earlier strip mining. This was the only practical use which Rhoads made of the silt.

It may be reasonably inferred that, because of Randall's intimate executive connection with both companies, the usual formalities of agreements between corporations may not have been observed by Rhoads and Counties. We reach this conclusion despite Randall's depositions in which he asserted the existence of an agreement and emphasized the distinct and separate corporate existence of each concern. The unexplained failure or inability of Randall to produce or describe the alleged written lease agreement lends strong support to our conclusion that none existed, but that Rhoads had, at least, implied permission to dispose of the silt upon Counties' land.

■ Rhoads abandoned the silt, from day to day as it was created, as worthless landfill, the ownership of which became vested in Counties as landowner.

"He cast it on land not his own, presumably for the sole purpose of getting rid of it, and thereafter to the end of his days at no time bothered about it. We * * * hold that the culm in dispute here became vested in to * * [the] * * *, owner of the land upon which it had been deposited." Fidelity Philadelphia Trust Co. v. Lehigh Valley Coal Co., supra, 294 Pa. p. 68, 143 A. p. 481.

We find wholly unpersuasive Randall's indefinite, self-serving declarations, during his depositions some ten years after he abandoned the silt, that he thought Rhoads was building up a future "equity" in the refuse. Randall never took any steps to claim the silt from the bank or Gilberton until his tax liabilities caused him to start

"looking for assets to pay Federal obligations." (n. t. p. 106)

"[I]t may not be claimed that * * * [RANDALL] * * *, learning of this recent creation of value, after many years of actual abandonment of the culm, could regain legal possession and control over it by the utterance of vaguely expressed ideas as to the probable future value of it and indefinite suggestions as to what he might do with it in years to come." Fidelity-Philadelphia Trust Company v. Lehigh Valley Coal Co., supra, p. 67, 143 A. p. 481.

That Rhoads, acting through Randall, persisted in its view that the silt was merely a useless and worthless waste product of the fine coal plant is further emphasized by the absence of any mention or reservation of rights to the silt either in the option or in the agreement to sell the Park No. 3 coal breaker to Park Trent. Fidelity-Philadelphia Trust Company v. Lehigh Valley Coal Co., supra, p. 61, 143 A. 474.

The omission underlines Rhoads' intention to abandon this material as worthless, in light of the careful, specific reservation of rights to remove 2000 tons per week from the Hazleton Silt Bank and the retention of all cinder banks on the land. We find it impossible reasonably to credit this significant omission to mere inadvertence or neglect.

If any doubt existed that Rhoads had abandoned the silt, that doubt was forever laid to rest by Randall's failure to assert any claim to the silt before, during or after the foreclosure proceeding. The intention to abandon, absent some declaration, must necessarily be inferred

from the acts and conduct of the party alleged to have abandoned. Randall's conduct consistently gave effect to Rhoads' intention to abandon. The initial act of incorporating the silt into the subsurface of the land, as fill, to eliminate a depression therein, demonstrated a dual intention to abandon the waste material and to confer a benefit on the landowner.

Park Trent claims ownership of the silt by virtue of its agreement with Rhoads on November 29, 1954. However, this was an agreement by Rhoads "to sell", not a sale. Moreover, Counties, which then owned the silt, was not a party to the agreement to sell. While the agreement is inartfully drawn, it refers specifically to six items which were to be sold to Park Trent, none of which included the silt. Equally silent on this score is the option from which the agreement derived its viability. No evidence of any transfer of ownership pursuant to the agreement to sell was produced.

Park Trent's Treasurer who was an attorney examined and approved the agreement. We conclude that it is not so ambiguous as to warrant our interpolation of terms which the parties did not include in their bargain.

When the agreement was executed Park Trent had notice and knowledge that Counties, a corporation separate and distinct from Rhoads, was record owner of the surface of the land. That Park Trent was also aware of the mortgage thereon to Hazleton National Bank may be inferred from the mortgagee clauses in Park Trent's policies of insurance on the breaker. We conclude that Park Trent acquired no title to or interest in the pre-existing accumulation of silt deposit there present when Park Trent entered into possession of the tract.

However, the silt which was later deposited by Park Trent upon the pre-existing silt deposit made by Rhoads presents a different problem. While Park Trent simply added to the existing silt on Counties' land, it did exercise dominion over the silt which emanated from its

operation of the fine coal plant. Its sale to New Jersey Zinc of 1000 tons of silt manifested an assertion of title to the silt which it had produced. This title, so asserted, was not lost when Park Trent vacated the premises because of financial problems, since no contemporaneous or later intent to abandon was manifested.

After the sale by the bank to Gilberton, Park Trent attempted to enter Gilberton's land to remove silt, but was refused entry. The letter from Park Trent's attorney to the bank, dated January 23, 1957, indicates that Park Trent still claimed title to the silt and negates any intention to abandon its silt.

Although Park Trent initiated no legal proceedings to have its claim adjudicated, it has actively asserted its rights in the present litigation, which was commenced by Gilberton in 1958. We cannot say that, under the preponderance of credible evidence, Park Trent demonstrated an intention to abandon the silt which it produced during the eleven months it operated the Park No. 3 breaker.

Gilberton entered into possession of the silt to which it claims title by virtue of the deed from Hazleton National Bank, which specifically refers to "culm banks" and "cleaning plant". The bank, in turn, claimed to have derived its title by reason of its possession and appropriation of the silt, all of which it regarded or believed to be abandoned.

The bank, after foreclosure, with the acquiescence of Rhoads and of Counties, did enter into peaceable possession of the coal-breaker, Park No. 3 and of the entire silt deposit upon what was, by foreclosure, the bank's land. This was done without the entry of judgment against Rhoads on its note or chattel mortgage or the issuance of any writ of execution. Counties, at that time, was the owner of the silt deposited previously by Rhoads because of the latter's abandonment. Counties interposed no objection to the bank's possession of that silt, then or later, despite the fact that the bank intended to and did claim title to the silt so possessed.

In light of Counties' acquiescence in the bank's appropriation, possession and exercise of dominion and its continued silence and inaction, we reach the conclusion that Counties, in turn, intended to and did abandon to the bank, as owner of the tract, that accumulation of silt which Counties had acquired by Rhoads' abandonment.

Thereafter, the bank continued to manifest its assertion of ownership, when it unsuccessfully attempted to sell the silt to the Pennsylvania Power and Light Company.

The bank, however, could convey title only to that which it had acquired by its mortgage foreclosure and by the successive abandonments of Rhoads and Counties. Since we hold that Park Trent never abandoned its portion of the silt, the bank never acquired ownership of that portion and, so, passed no title thereto to Gilberton.

However, Gilberton may be entitled to a reasonable compensation for use and occupancy of that part of its land upon which the Park Trent silt was piled atop Gilberton's silt from December 11, 1956.

We must defer determination of the total quantity of the silt, its unit and total value and the amounts which belong to Gilberton and Park Trent, respectively and the compensation, if any due, Gilberton, pending further proceedings.

The defendant taxpayers have not contested the accuracy of the Government's assessments. Accordingly, the Government is entitled to judgment for the amounts of the assessments with interest, and to enforcement of its liens against that portion of the silt which we hold is owned by Park Trent.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The United States is entitled to judgment against Rhoads in the amount of $204,917.07 with interest.

3. The United States is entitled to judgment against Park Trent in the amount of $36,345.80 with interest.

4. The liens of the United States are valid against that portion of the silt owned by Park Trent.

5. The liens of the United States are invalid against that portion of the silt owned by Gilberton.

6. That portion of the silt owned by Gilberton is entitled to be discharged from the liens filed by the United States.

## ORDER

Now, this 22nd day of June, 1966,

It is ordered that counsel shall submit an appropriate form of judgment within 30 days, providing therein, inter alia, for further proceedings to determine the total quantity of silt, the unit and total value thereof, the amount thereof subject to the liens of the United States and the amount or credit, if any, due Gilberton for partial use and occupancy by the silt upon which the liens of the United States are valid.