531 A.2d 17

**Joseph Denniston LEET, a/k/a Joseph D. Leet, a/k/a Joseph L. Leet, a/k/a Joseph Irwin Leet, a/k/a Joseph Leet Anslinger, Mary Bernice Anslinger, a/k/a Mary Bea Anslinger, Anna Hartman Good, a/k/a Anna Duncan Hartman, a/k/a Anna H. Good, Widow**

v.

**Joseph VINGLAS, Appellant.**

Superior Court of Pennsylvania.

Submitted June 4, 1987.

Filed Sept. 10, 1987.

Elizabeth A. Dougherty, Harrisburg, for appellees.

Before DEL SOLE, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This is an appeal from the judgment of the Court of Common Pleas of Cambria County granting an action to quiet title in favor of the plaintiffs (Joseph L. Anslinger and Anna H. Good, individually and as executrix of the estate of Jesse L. Hartman) and against the appellant/defendant (Joseph Vinglas). We affirm.

The facts of record disclose that the plaintiffs filed a complaint seeking to quiet title to property leased to the defendant, for coal mining purposes, by Articles of Agreement dated July 1, 1953, which made provisions for remuneration and the length of the agreement in the following passages:

ARTICLE 2. The party of the second part shall pay to J. Gerst Denniston of 616 Pine Street, Hollidaysburg, Pennsylvania, who is hereby designated by all the other lessors as their agent to receive said payment, the sum of Twenty-five (25¢) cents per net ton for the coal mined and removed as determined at the scales; settlement to be made at the end of each and every month during the continuance of this lease, or within thirty (30) days thereafter, the first settlement to be made on October 1, 1953 and to thence continue monthly thereafter.

ARTICLE 3. The term or period covered by this lease shall be for such time as the lessee shall continue to mine and operate on said tract, which mining operations shall be considered to continue until such time as the lessee decides to remove from the operations his mining equipment, tools, rails, buildings, etc., all of which said lessee is hereby authorized and empowered to remove at the time he decides or determines to cease mining operations.

It was also alleged in the complaint that the defendant, as of May, 1968, had ceased operating the leased premises and "thereupon abandoned the mining operation." (Paragraph 6) Further, the plaintiffs averred that the defendant, in violation of Articles 2 and 3, had not only "refused, failed and neglected to 'continue to mine and operate on said tract' ", but he had "not accounted for nor ha[d] he paid any

royalty for coal removed from the leased premises for a period of ten years dating from May, 1968" to the date of their May 22, 1978 complaint to quiet title. (Paragraphs 8 & 9)

Accordingly, the plaintiffs demanded, inter alia, that: (a) the July 1, 1953 agreement be declared null and void, as well as breached, broken and repeatedly violated; and (b) the defendant be barred from asserting any right, lien, title or interest in the leased premises.

In reply, the defendant filed an answer denying that he had removed any equipment, tools, rails or buildings from the site, or that he had any intentions of abandoning the mining operation.

Once a certificate of readiness for trial was filed with the prothonotary, the matter proceeded before the Honorable Eugene A. Creany for disposition in a bench trial, but not before each side submitted, pursuant to local rules of court, pre-trial statements reflective of their respective positions on the question of abandonment.

The trial judge heard evidence on June 25 and 26 of 1984. Thereafter, on October 23, 1985, following the submission of briefs by counsel, an opinion (making findings of fact and conclusions of law) and order were issued granting the plaintiffs' action to quiet title. Judgment was entered on September 15, 1986. This appeal followed and questions, initially, the trial court's conclusion that the defendant abandoned the operation of the upper Freeport Vein in Cambria County, also known as the "E Vein".

In commencing our discussion on the merits of the issue posed, we look to our Supreme Court's discussion of the elemental aspects of abandonment and the requisite proof to establishing the same; to-wit:

This Court said, in *United Nat. Gas Co. v. James Bros. L. Co.*, 325 Pa. 469, 473, 191 A. 12, 14: "Mere nonuser [sic] does not constitute abandonment; there must be an intention to abandon, together with 'external' acts by which such intention is carried into effect; ordinarily, this raises a question of fact to be determined by a jury.

*Llewellyn v. Philadelphia & Reading Coal & Iron Co.*, 308 Pa. 497, 501, 502, 162 A. 429." Further, in this connection, it is stated in Barringer and Adams on The Law of Mines and Mining in the United States, Vol. 2, p. 229: "Abandonment being a question of fact, its determination belongs to the jury and is to be reached by a consideration of the fact of the cessation of work and of the lessee's explanation thereof. If that cessation is unexplained and has lasted for an unreasonable time, a presumption of abandonment arises * * *."

*MacCurdy v. Lindey*, 349 Pa. 655, 658, 37 A.2d 514, 516 (1944).

To elucidate on the preceding barometer, we note the criterion that the intention to abandon, absent some declaration, must necessarily be inferred from the acts and conduct of the party alleged to have abandoned. See *Eagan v. Nagle*, 378 Pa. 206, 106 A.2d 222 (1954); *Gilberton Contracting Co. v. Hook*, 255 F.Supp. 687 (E.D.Pa.1966). No less is the nature of the property to be given due consideration, in conjunction with one's conduct, in assessing the question of abandonment. See *Llewellyn v. Philadelphia & Reading Coal & Iron Co.*, 308 Pa. 497, 502, 162 A. 429 (1932).

■ Thus, when crystalized, our task is to determine whether the trial court's findings of fact, which led to the legal conclusion that the defendant "abandoned" the mining of the "E Vein" at the Vinglas Coal Company, are supported by competent evidence. See *MacCurdy*, supra.

The record shows an accounting by the defendant and his partners/brothers (Walter and John), all of whom testified that it was never their intention to abandon the mining of coal from the upper Freeport Vein, despite a ten-year hiatus (beginning in 1968 and continuing to the date of the filing of the instant complaint in 1978) during which no coal was extracted. Also, during this time, the plaintiffs received no royalties provided for under Article 2 of the 1953 Articles of Agreement.

The reasons proffered by the defendant and his witnesses for refraining from engaging in the business of deep-mining coal were two-fold: First, economic factors depressing the price of coal counselled against pursuing the joint venture beyond 1968. Second, given the soft coal market, government regulations dictating the installation of methane detectors, dust collectors and additional openings ("drifts") in the mine for entry rendered prohibitive a continuation of the business of deep-mining coal.

Strip mining was an alternative provided for under the lease, but was conditional upon the lessors approving the practice. Allegedly, the refusal by the lessors, in particular a Mr. Anslinger, to sign a necessary document ("Form C") required by a 1974 government regulation negated this option, and, in effect, foreclosed the defendant from subleasing the mining operation to a Mr. Sheehan. This version was refuted by counsel for Mr. Anslinger, who did not recall any meeting at which the proposal of strip mining was presented as a viable alternative to deep-mining.

Further, the defendant's case consisted of the testimony of the Cresson Township Police Chief, Clifford T. Gailey, who recalled being summoned to the mine in 1974 and 1980 because of vandalism reports. On both occasions, the officer recounted arresting individuals caught in the act of dismantling, cutting and loading, for hauling purposes to a "junk" dealer, mine cars, rails and motors.

The 1980 incident is of interest in that the theft charges lodged against the accused were dismissed by the District Justice on the ground that the property was "abandoned", and, therefore, could not be the subject of a criminal prosecution.

Anthony E. Valeri, a one-time mine inspector for the Pennsylvania Department of Mines and Mineral Industries, appeared on behalf of the defense and testified that, on April 27, 1970, he issued a report on the status of the defendant's mine. In the "Remarks" section he typed that the mine had been on the "Idle list" and that the defendant wanted to "resume mining operations as soon as possible."

However, before any mining could be commenced, violations in the form of inadequate ventilation, obstruction of the air shaft with rocks, loose rock on the "haulage" road and broken timber along the "track haulage" would all have to be remedied before approval would be forthcoming from the Department of Mines and Mineral Industries to operate.

Also entered into evidence was a November 22, 1971 letter from Valeri to John Vinglas, which read in relevant part:

> Relative to your complaint against Crain's Poultry, Inc; [sic] for Sewage dumping into your Vinglas Mine. Will you please advise me in writing of the situation. I will then contact the owners and make necessary investigation.

Lastly, by affidavit dated May 17, 1978, the defendant acknowledged being advised by Valeri of the requirement in the law that, as of September 7, 1978, "at least one Emergency Medical Technician ... must be on every production shift."

Albeit Valeri stated that the defendant and his brothers "were always talking about opening" the mine, it is uncontroverted that, by the time the witness retired in 1981, none of the violations listed in his 1970 report was rectified, and, therefore, the mine was not entitled to be reopened. In his words, "It remained the way it was, inactive."

The plaintiffs introduced into evidence seven black and white still photographs, taken on the 3rd of June, 1976, of the Vinglas Coal Company, which depicted, in graphic terms, a mining operation which was allowed to become dilapidated and dangerous and its value depreciated by nonuse and natural elements.

Walter Vinglas, a partner in the Vinglas Coal Company, attempted to rebut the obvious deteriorated condition of the premises captured by the camera's eye. For example, roofs to the storage shanty and weigh station had collapsed, as well as the "snow" roof to the tipple and a trestle devoid of rails were no longer functional. Whether these events, to name just a few endemic to the operation as a whole, be the

product of nature or scavengers attracted to locations of this type, the fact remains that the evidence produced is consistent with a finding of abandonment.

A case wherein "actions speak louder than words" could not have been drafted any better than the scenario at bar. For instance, we have the protestations of the defendant and his brothers that the last thing they wanted to occur was the loss of the mine. If we were to cease our inquiry here, the spoken intentions of the contestants would refute any evidence of abandonment predicated upon an "intention to abandon". However, our inquiry is not restricted to the spoken word. On the contrary, we are accorded the liberty to scrutinize one's conduct to ascertain the "true" intention of the defendant and his brothers through their overt actions. See *Hatcher v. Chesner*, 422 Pa. 138, 221 A.2d 305 (1966); *Eagan*, supra; *MacCurdy*, supra.

We have evidence of the Pennsylvania Department of Transportation constructing a highway dividing the leased premises in half—30 acres on each side. This work, admittedly, resulted in the Vinglas Coal Company's underground equipment, valued by Walter Vinglas at $150,000 to $200,000, to be buried, and necessitating excavation of at least 50' to 52' below the surface before entrance to the mine could be accomplished. Yet, no action has been initiated by the defendant to recoup the loss of his equipment, which, given the defendant's admission of the "expensive" nature of a salvage operation, is not inconsistent with abandonment.

In the same vein, a complaint to the Department of Mines and Mineral Industries of the dumping of poultry refuse in the mine, albeit acknowledged as having been received by the Department, was never pursued by the defendant.

Next, and most glaring of all, is the failure of the defendant and his partners to comply with the Department of Mines and Mineral Industries' conditions precedent to reactivation of the deep-mining process. The defendant's remarks that, had his request for strip mining been approved by the lessors, the need to comply with the Depart-

ment's findings concerning violations would have been obviated by the above-ground extraction of coal wears thin when one calculates that since 1968 coal mining at Vinglas Coal Company has become non-existent. This status quo, under the defendant's reading of Article 3 of the lease, could be maintained *ad infinitum* by not removing any of the equipment from the premises. We refuse to embrace this position since "a lease will not be construed to create a perpetual term unless the intention is expressed in clear and unequivocal terms." *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 202 n. 5, 519 A.2d 385, 390, n. 5 (1986).

Instantly, the lease is anything but clear on the matter of its duration. The preamble purports to allow the lessee to mine "all the remaining coal, pillars and stumps presently located under" the leased premises. However, it is written in Article 7 that "this mining operation is for the purpose of cleaning up former mining operations...."

At trial, the court opined that "the purpose ... of this mining lease ... was for cleaning up the remaining, former mining operations. So, once you have cleaned up these mining operations, the lease by its terms, by its intent would terminate." The defendant disagreed and asserted that the lease remained in effect until all of the coal had been removed, and that he had no obligation to mine either.

If the defendant's position won out, the lease could extend in perpetuity so long as the defendant kept his equipment on the site, despite the fact that he refrained from mining coal. This would, and did, result in no royalty payments (25 cents per ton) to the plaintiffs, and when coupled with the defendant's unilateral right to not mine makes for a lease which most definitely favored its drafter, the lessee/defendant.

█ Since the two paragraphs are susceptible to conflicting interpretations, we find them to be ambiguous and open to extrinsic evidence to explain the parties' intent, and no need to remand is necessary. See *Hutchison,* supra.

Thus, given that a writing is to be construed against its drafter and not in perpetuity absent clear and unequivocal terms (which are not present here, see *Hutchison*, supra), we find that the parties did not intend the lease to be perpetuated by the mere reservation of the defendant's equipment on the premises in the face of evidence of "abandonment" of the mining operation. Such a conclusion is premised on a plethora of facts, some of which have been discussed supra, and one other is the condition of the property. It becomes obvious that the seeming inoperability of the equipment and deteriorated condition of the buildings cannot be dismissed out of hand by the mere reference to the superlatives ("A–1" and "excellent" to mention a few) used by the defendant and his partners to describe their status. Especially is this so in the face of direct evidence of their being labelled, at least in part, as "junk" by the police officer writing the reports describing the items stolen from the premises by the poachers in 1974 and 1980.

Accordingly, we agree with the trial court's conclusion of abandonment, and its approval of an implied duty to mine as a predicate for such a holding. This position is consistent with the ruling in *Hutchison*, supra, which approved of such an implied duty in this Commonwealth where a lease agreement, as is the case instantly, does not provide for the payment of minimum mining royalties in the absence of mining. See *Hummel v. McFadden*, 395 Pa. 543, 150 A.2d 856 (1959).

Lastly, as for the defendant's contention that the judge should have recused himself from the trial because of alleged instances of bias and prejudice committed during the proceedings, we find, despite the fact that the claim appears for the first time in the defendant's brief, its treatment by all concerned warrants, in the interest of judicial economy, a response. See *Commonwealth v. Sudler*, 497 Pa. 295, 301, 436 A.2d 1376, 1379 (1981); *Commonwealth v. Nelson*, 311 Pa.Super. 1, 456 A.2d 1383 (1983); *Commonwealth v. Jones*, 300 Pa.Super. 338, 348 n. 3, 446 A.2d 644, 649 n. 3 (1982). And, in addressing the

matter, we find that the allegations appearing in the appellant's Brief at pages 20a–27a, even viewed in a light most favorable to the complainant, do not rise to the level implying any bias or prejudice on the part of the trial judge. Accordingly, no abuse of discretion having occurred in denying the recusal motion warrants a denial of the relief requested. See *Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 489 A.2d 1291 (1985); *Municipal Publications, Inc. v. Court of Common Pleas of Philadelphia County,* 507 Pa. 194, 489 A.2d 1286 (1985).

Judgment affirmed.