Thomas *v.* Thomas Flexible Coupling Company,
Appellant.

Argued September 26, 1945; reargued January 9,
1946. Before MAXEY, C. J., DREW, LINN, STERN, PAT-
TERSON, STEARNE and JONES, JJ.

*R. Pierson Eaton* and *William T. Hannan,* for ap-
pellant.

*Walter B. Gibbons,* with him *J. H. Alexander,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, March 25, 1946:

Because of a decision of the Tax Court of the United States in passing upon the liability of the defendant company for income and excess profit taxes for the years 1939, 1940 and 1941, a question arose between plaintiff and defendant as to whether certain contracts between them were invalid for want of consideration. Accordingly they joined in asking the Court of Common Pleas of Warren County, where the company's plant is situated, for a declaratory judgment in order to resolve that doubt.

Bertha E. Thomas, plaintiff, owned a certain basic patent for flexible couplings, and, on January 6, 1920, submitted a written proposal to defendant that, if it would issue to her 450 shares of its capital stock and would pay her a royalty fee of ten per cent of the total amount of the gross sales of the couplings during the life of the patent, she would assign the patent (No. 1,325,-545) to defendant, reserving to herself, however, the exclusive right under said patent to manufacture and sell flexible couplings for use on motor vehicles; in the event of defendant's increasing its capital stock at any time plaintiff was to be entitled to receive, without further consideration, fifty per cent of such increase. This proposition was accepted by defendant, and, on March 20, 1920, a more formal and comprehensive agreement was executed whereby plaintiff assigned to defendant all her right and interest in two other patents owned by her (Nos. 1,323,423 and 1,326,993), together with all improvements upon the inventions there described, and also all patents on flexible couplings and on future improvements on flexible couplings which might thereafter be granted to her; defendant in turn, granted plaintiff the exclusive right to make and sell,

under these patents and subsequent improvements thereon and under any patents owned or to be owned by defendant, flexible couplings to be used in connection with automobiles, trucks and tractors.

Plaintiff received the 450 shares of defendant corporation's stock and also, for the seventeen years' duration of the life of the patent, the ten per cent royalties stipulated in those agreements.

In 1929 the financial condition of the corporation was such that it became necessary for it to raise funds by the sale of additional stock but found itself handicapped in that attempt by plaintiff's right to receive fifty per cent of any such increase. Plaintiff was thereupon induced to enter into an oral agreement whereby defendant was to continue to pay her the ten per cent royalties based on the gross income from its sales of couplings under the patents, but all other provisions of the contracts between them were cancelled and nullified. When the new stock was issued plaintiff purchased and paid for 50 shares at their par value of $100 per share, and when, after this parol rescission of the agreements, defendant made and sold couplings for use on automotive equipment, plaintiff made no claim to the profits of such sales to which she would otherwise have been entitled under the reservation of her rights in that regard in the 1920 contracts.

On September 2, 1937 plaintiff filed an application for a patent for a new and improved flexible coupling. While this application was pending, on January 17, 1939, she made a written proposal to defendant that, in consideration of the sum of $3,500 and the payment to her of a royalty of six per cent of the invoice price of complete couplings sold by the company and of a royalty of 33⅓ per cent of the invoice price of discs (parts of the couplings) sold separately,—the total royalties to amount to not less than $250 a month and to extend for the life of the patent,—she would assign to defendant the United States and Canadian rights to

the application then pending as well as to any other patent for which she might apply up to the time when the then pending application would be granted. This proposition was accepted by defendant, and, on October 26, 1939, while the draft of the agreement to be executed by the parties was still in the course of preparation, she assigned to defendant the exclusive right, for the United States and all foreign countries, to the application filed on September 2, 1937, to another application which she had filed on August 8, 1939 for a patent for emergency supports for flexible couplings, and to any patents that might be issued on those applications. On November 26, 1939, the formal contract was executed embodying the terms which had been agreed upon in January. One of its provisions was that plaintiff would assign to defendant "her *entire* title, right and interest in and to all pending applications, patents, or applications which may be filed in the future and in and to any inventions therein set forth which relate in any way to flexible couplings." Subsequently the patents (Nos. 2,182,711 and 2,251,722) which were granted on the two applications of September 2, 1937 and August 8, 1939 were issued to defendant pursuant to the assignment which plaintiff had executed, and from then on defendant paid plaintiff the royalties provided for in the agreement of November 26, 1939. In June, 1943 defendant requested plaintiff to reduce the royalties, and, after several months of negotiations, a supplemental contract was entered into on November 26, 1943 which provided that defendant was to assign to plaintiff all of its right, title and interest in and to the patents Nos. 2,182,711 and 2,251,722, and plaintiff, in turn, was to grant to defendant, for the life of those patents, an exclusive license to make and sell flexible couplings thereunder and under an application for another patent which plaintiff had filed on March 6, 1943. In lieu of the royalties provided for in the agreement of November 26, 1939, defendant was to pay to plaintiff,

retroactively effective as of July 1, 1943, a royalty of six per cent of the invoice price of all couplings and parts thereof manufactured and sold by it, the maximum royalties in any one year not to exceed $80,000. The provision in the former agreement that plaintiff would assign to the company all applications that she might file in the future relating to flexible couplings was cancelled. Except as thus modified the contract of November 26, 1939 was to remain in full force and effect. The royalties provided for in this 1943 agreement were thereafter paid to plaintiff until March 21, 1945.

The questions raised in the petition for a declaratory judgment are whether the contracts of November 26, 1939 and November 26, 1943 are valid or whether they fail because of lack of consideration; whether plaintiff was entitled to receive and now to retain the royalties paid to her under those agreements; whether the patents covered by those agreements (Nos. 2,182,711 and 2,251,722) belong to defendant by virtue of plaintiff's assignment of October 26, 1939, or to plaintiff under defendant's re-assignment thereof in accordance with the agreement of November 26, 1943; and whether plaintiff is entitled to the royalties that have now accrued and those that will accrue hereafter under the 1943 agreement.

The Tax Court of the United States was of opinion that defendant was entitled by virtue of the agreement of March 20, 1920 to receive from plaintiff an assignment of the two patents here in controversy, and that defendant's agreement to pay royalties on those patents, as provided in the contracts of 1939 and 1943, was without consideration; further, that the patents, having been assigned to defendant on October 26, 1939, were already owned by it at the time the agreement of November 26, 1939 was entered into; also, that plaintiff did not, in the 1939 agreement, abandon any of her rights to the manufacture and sale of flexible couplings for automo-

tive purposes, and that, in any event, such rights were of no value and even their relinquishment, therefore, would not constitute consideration. In the present declaratory judgment proceedings in the court below views exactly contrary to these were adopted and a decree was entered sustaining the rights to the royalties and the patents claimed by plaintiff under the 1939 and 1943 agreements; it is from that decree that the present appeal has been taken.

We are of opinion—for the reasons following—that the decision of the court below is the correct one.

1. The petition for the declaratory judgment alleges, and defendant's answer admits, that in 1929 the parties orally agreed to cancel the then existing contracts between them, except that defendant was to continue to pay the ten per cent royalties. If such a parol agreement was made it is, of course, legally effective: *Merchants-Citizens National Bank, Executor, v. Mauser,* 297 Pa. 399, 404, 147 A. 90, 91; *Magazine Digest Publishing Co. v. Shade,* 330 Pa. 487, 492, 199 A. 190, 193; *Shaffer v. Scharding,* 348 Pa. 423, 35 A. 2d 270. That it was in fact made is evidenced by plaintiff's purchase of some of the stock then issued by defendant instead of obtaining it gratis as was her right under the cancelled contracts; it is evidenced also by her failure at any time thereafter to claim the profits on defendant's manufacture and sale of flexible couplings for use on motor vehicles to which she would have been entitled under those contracts. In any event, we are bound by the allegations of the pleadings which assert that there was such a cancellation, and, plaintiff's obligations under the 1920 agreements having thereby ceased, no question of lack of consideration to support the 1939 and 1943 agreements can arise.

2. Even if there had been no parol agreement of cancellation in 1929, the 1920 agreements terminated, in our opinion, with the expiration in 1937 of the life of the patents which constituted their subject-matter. It

would seem incredible that, in assigning the three original patents to defendant for a royalty fee of ten per cent on the gross sales, and in agreeing to assign all future improvements and all patents that might thereafter be granted to her, the parties contemplated that, after those patents were no longer in force and plaintiff would not be receiving any further royalties therefrom, she would nevertheless remain bound, during the entire balance of her life, to assign to defendant, free of any claim for royalties thereunder, any and all patents for flexible couplings which she might thereafter acquire. What the parties undoubtedly intended was that, *as long as the patents assigned under the 1920 contracts remained in force,* defendant was to have the benefit of all improvements thereon invented by plaintiff and of all patents obtained by her; she herself would profit therefrom by continuing to receive the ten per cent royalties on the sales of the improved couplings. Where there is no express provision in a contract as to its duration the intention of the parties in that regard is to be determined from the surrounding circumstances and by the application of a reasonable construction to the agreement as a whole. Thus considered, it seems to us perfectly clear that the 1920 agreements were not in force when the 1939 agreement was made.

3. Even if, however, the 1920 contracts were still effective when the agreement of 1939 was entered into there was nevertheless a consideration in the latter agreement for defendant's undertaking to pay plaintiff the royalties therein specified because she gave up, in that agreement, her rights in regard to the manufacture and sale of the couplings for automotive use; she contracted to assign to the company her *entire* right, title and interest in and to all of the then pending applications and patents and all future applications relating in any way to flexible couplings, thereby relinquishing the rights reserved to her with regard to motor vehicles as specified in the previous contracts. The Tax

Court took the position that those rights were not of any value; that finding is negatived by the allegations of the present pleadings, but, in any event, it is an elementary principle that the law will not enter into inquiry as to the *adequacy* of the consideration: *Hillcrest Foundation, Inc. v. McFeaters*, 332 Pa. 497, 503, 2 A. 2d 775, 778.

4. The assignment of patents Nos. 2,182,711 and 2,251,722 by the instrument dated October 26, 1939 was in pursuance of the agreement of January 17, 1939 and was made in anticipation of the subsequent drafting of the terms then agreed upon. The fact that it was delivered a month before the execution of the formal contract is, therefore, of no legal significance.

5. As far as the agreement of November 26, 1943 is concerned, it is sufficient to point out that the re-assignment of the patents which defendant there agreed to make was in consideration of a substantial reduction by plaintiff of the royalties specified in the agreement of November 26, 1939. The 1943 agreement was merely a "supplemental" one, and is so characterized in its initial sentence.

The decree and judgment are affirmed, costs to be divided between the parties.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

The alleged contract between the plaintiff and defendant here involved was before the United States Tax Court on the defendant company's effort to justify, as "ordinary and necessary expenses" of its trade or business, payments made by it to the plaintiff under the contract. The Tax Court found that the contract was without consideration; that the payments made thereunder by the taxpayer (the defendant company) were gratuities; and, that they were therefore not deductible from the defendant's gross income for tax purposes.

I am no more able to find consideration for the alleged contract than was the Tax Court whose findings

were by reference expressly incorporated in the plaintiff's petition for a declaratory judgment. Consequently, so far as the merits of the case are concerned, I should reverse the judgment of the court below. But, my further view is that the merits of the case, whatever they may be, never became actionable in this proceeding.

The facts do not present a case for the exercise of the court's declaratory judgment jurisdiction. No actual controversy is pleaded or present. The necessity of such a controversy as the basis for a declaratory judgment proceeding has long been recognized generally. True enough, the requirement was not, in terms, expressly included in our original Declaratory Judgments Act of June 18, 1923, P. L. 840 (12 P.S. §§ 831 et seq.). But, in *Kariher's Petition (No. 1)*, 284 Pa. 455, 131 A. 265, where that Act was considered and upheld, it was pointed out (p. 471) ". . . that, in all jurisdictions where declaratory-judgment practice obtains, the rule is established . . . that jurisdiction will never be assumed unless the tribunal appealed to is satisfied that an actual controversy, or the ripening seeds of one, exists between parties, all of whom are sui juris and before the court, and that the declaration sought will be a practical help in ending the controversy: [citing cases] . . ." And, the amendatory Act of April 25, 1935, P. L. 72, expressly made the existence of "an actual controversy" a prerequisite to a court's exercise of declaratory judgment jurisdiction by substituting, inter alia, for Sec. 6 of the Act of 1923 the following,— "Relief by declaratory judgment or decree may be granted in all civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which he has a concrete interest and that there is a challenge or denial of such asserted

relation, status, right, or privilege by an adversary party who also has or asserts a, concrete interest therein, and the court is satisfied also that a declaratory judgment or decree will serve to terminate the uncertainty or controversy giving rise to the proceeding." [1]

There is not now nor has there ever been any controversy between the parties to the record in this proceeding either as to the alleged contract or as to the plaintiff's right to the moneys which she claims thereunder. Throughout the contest over the defendant company's tax liability with the Commissioner of Internal Revenue and before the Tax Court, including the rehearing granted on the defendant company's petition, the latter at all times asserted and endeavored to maintain the validity of the alleged contract and the plaintiff's rights thereunder as claimed by her. Even in the present proceeding the defendant by its answer sought to make a showing of facts more favorable to the plaintiff's claim than she herself had averred in her petition. There is certainly no controversy between the plaintiff and the defendant with respect to the alleged contract and the rights of the parties thereunder. Yet, that is the entire subject matter of the instant proceeding. The requisites of "an actual controversy" necessary to present a justiciable question cognizable in a declaratory judgment proceeding are not present so far as the rights of the parties to the record are concerned.

As a corporation may dispose of its property as it chooses so long as it does not defraud creditors or violate the rights of stockholders, it was apparent when this appeal was first argued that only creditors and stockholders could possibly be concerned with the effects of what the plaintiff and the defendant had allegedly agreed upon *inter se* and were endeavoring to have this

---

[1] Sec. 6 of the Declaratory Judgments Act of June 18, 1923, P. L. 840, as amended by the Act of April 25, 1935, P. L. 72, was still further amended by the Act of May 26, 1943, P. L. 645, in a manner not presently material.

court stamp "Valid". As no creditor was complaining (the record indicated a highly solvent corporation), we set the appeal down for reargument and required the defendant company (a close corporation) to give specific notice to all stockholders of what was involved in the case and inviting them to become parties to the record in this court to voice any objection they might have. The company duly complied with our requirement and the result was a special meeting of stockholders (with knowledge of the impending reargument and its prescribed prerequisite) at which meeting the stockholders not only approved the alleged contract but also volunteered to give the management a "vote of confidence". Thus, there is manifestly no one with a penny's worth of material interest in the subject matter of this proceeding to contend with anyone else interested materially therein. Consequently, no "actual controversy" exists.

The only controversy there is or ever has been in this case is the dispute, past and prospective, between the defendant company and the Commissioner of Internal Revenue as to whether payments made by the defendant to the plaintiff under the alleged contract qualify as ordinary and necessary business expenses within the meaning of the Federal Revenue Acts. With that question, we, of course, are not concerned. But, it is counsel's expressed thought that a decision by this court upholding, as a matter of Pennsylvania property law, the alleged contract and the parties' rights thereunder (upon which they are in complete agreement) will be binding upon federal tribunals and that, thereby, the payments made by the defendant to the plaintiff under the alleged contract will become "ordinary and necessary [business] expenses". In my opinion that conception rests upon a misunderstanding of the pertinent law. Incidentally, the rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, which is so strongly stressed in the briefs, has no pertinency whatsoever to an adjudica-

tion of a taxpayer's liability under Federal Revenue Acts. Such questions are governed by federal law, uninhibited by state court rulings. Regardless, therefore, of what the status of the alleged contract in the instant case may be under Pennsylvania law, whether the payments made thereunder constitute allowable deductions in ascertaining the defendant company's federal tax liabilities is exclusively a federal question: see *Commissioner v. Francis E. Tower*, 327 U.S. ——— (decided February 25, 1946). The defendant may be sure that no matter what is done in this case on the basis of state law it will neither hamper nor becloud the Commissioner of Internal Revenue or the Tax Court in correctly identifying the tree which grew the taxable fruits: cf. *Lucas v. Earl*, 281 U.S. 111, 115.

To paraphrase an apt expression of Mr. Justice DREW in *Kahn v. William Goldman Theatres, Inc.*, 341 Pa. 32, 34, 17 A. 2d 340, all that the parties to the instant proceeding sought was the confirmation of the opinion of their respective attorneys who were in amiable agreement on the matter. They hoped for a court opinion favorable to the plaintiff and for nothing else, substantially an advisory opinion although ". . . such opinions are not contemplated under this legislation": see *Kahn* case, supra, at p. 36. In *Taylor v. Haverford Township*, 299 Pa. 402, 406, 149 A. 639, this court said that "We are determined that the Declaratory Judgments Act, an excellent piece of legislation when kept within proper bounds, shall not be used in cases to which it is not properly applicable." In my view, the benefits of declaratory judgment jurisdiction will best be safeguarded by a strict observance of the caution laid down in the *Taylor* case. As the instant case does not present "an actual controversy", I should reverse the judgment and remand with directions to dismiss the proceeding for want of jurisdiction.