NOVA CHEMICALS, INC.,

v.

SEKISUI PLASTICS CO., LTD, Appellant.

No. 08–4090.

United States Court of Appeals, Third Circuit.

Argued May 20, 2009.

Opinion Filed: Aug. 28, 2009.

Walter H. Flamm, Jr., Michael J. McCaney, Jr., Flamm, Boroff & Bacine, PC, Blue Bell, PA, Attorneys for Appellants.

John M. McIntyre, David J. Bird, Reed Smith LLP, Pittsburgh, PA, Attorneys for Appellees.

Before FUENTES, JORDAN and NYGAARD, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge:

In 1983, NOVA Chemicals, Inc. and Sekisui Plastics, Co., Ltd. entered into a Li-

cense Agreement under which NOVA was permitted to use a new process to produce a Styrofoam-type product called Piocelan. Under the agreement, NOVA was permitted to sell Piocelan products anywhere in the world, except in certain Asian countries. Nearly twenty years later, NOVA began selling Piocelan products in the Asian countries excluded from the License Agreement. After Sekisui objected that NOVA was in violation of the License Agreement, NOVA filed a complaint seeking declaratory relief. In granting summary judgment in favor of NOVA, the District Court determined that, based on the plain language of the License Agreement, all of its terms expired in 1995. Although we find certain portions of the License Agreement are ambiguous, we agree with the District Court that there is no reasonable interpretation of the agreement under which NOVA has any continuing obligations to Sekisui. Accordingly, we will affirm.

## I.

### A.

In 1978, ARCO Chemical Company ("ARCO" or "ACC"),[1] a predecessor to NOVA,[2] entered into an agreement to license technology from Sekisui, a Japanese company. That agreement included an option to license an earlier version of Sekisui's Piocelan technology. However, ARCO determined that the process was impractical and permitted the option to

expire. By 1982, Sekisui had developed a better Piocelan process[3] and began to negotiate an agreement for ARCO to market the improved Piocelan products in the United States.

In October 1982, representatives from ARCO and Sekisui met in Japan. Sekisui prepared the first draft of the License Agreement and sent a translation to ARCO. The companies exchanged a number of drafts and proposed modifications. The final draft of the License Agreement was prepared by an ARCO attorney. The License Agreement was signed in December 1982 and went into effect in January 1983.

At the time the contract was negotiated, Sekisui was selling "expanded" Piocelan products that were difficult to ship long distances. While ARCO was interested in developing products that could be shipped, it was not interested in selling in the Asian market, where Sekisui was based.

### B.

Like the earlier agreement between the parties, the License Agreement gave ARCO an option to acquire a ten-year license to use Sekisui's Piocelan process. During the three year option period, the License Agreement also granted ARCO an exclusive license to use Sekisui's secret technical information and patent rights to produce Piocelan products and develop a market for them in the United States and Canada.[4] In particular, this initial license

---

1. ARCO was a Pennsylvania corporation with its principal place of business in Pennsylvania.

2. NOVA is a Delaware corporation with its principal place of business in Pennsylvania.

3. By Piocelan process we mean Sekisui's PO Polymer Manufacturing Process, PO–EPS Manufacturing Process, PO Pre–Expanded–Particle Manufacturing Process, PX Polymer

Manufacturing Process, PX–EPS Manufacturing Process, PX Pre–Expanded–Particle Manufacturing Process, and Colored Bead Technology. For clarity, we will refer to products manufactured using the Piocelan process as "Piocelan products."

4. ARCO could elect to extend the option period by one year at no additional cost, or to terminate the option and license at any time.

gave ARCO access to all technical information and know-how, including formulations and equipment designs, useful to produce various Piocelan products. The license also included:

> any United States or Canadian patents or patent applications in the United States or Canada now or hereafter owned or controlled by SEKISUI or wherein SEKISUI has licensing rights, which are based on inventions made on or before [January 1, 1983], to the extent that any of the claims thereof cover [Piocelan products or technology].

(License Agreement ¶ 1.9.) In exchange for the three-year option and initial license, ARCO agreed to pay Sekisui $100,000 in two installments—$50,000 at the beginning of the option period and $50,000 within eighteen months.

Sekisui agreed that it would disclose within the first three months of the option period, "all technical information and data" related to the Piocelan process. Sekisui also agreed to provide any technical assistance ARCO needed to implement the Piocelan process.

ARCO agreed to keep information provided under the License Agreement "secret and confidential from any third party .... for a five (5) year period from the date of termination" if ARCO elected to terminate the contract without exercising its option and "for a period of ten (10) years from the date of exercise" if ARCO did exercise its option to acquire a ten-year license. (*Id.* art. IV.)

If ARCO exercised the option, Paragraph 5.4 of the License Agreement provided that Sekisui would "automatically" grant ARCO a ten-year exclusive license "under all [of Sekisui's intellectual property] to produce, sell and use [Piocelan products] in the [United States and Canada]

... [and a nonexclusive license] to sell [Piocelan products] in all countries of the world except in the following countries: Japan, Korea, China, Hong Kong, Philippines, Vietnam, Thailand, Malaysia, Singapore, Indonesia, India, and Pakistan." (*Id.* ¶ 5.4.) In exchange for these rights, ARCO agreed to make a $500,000 lump sum payment,[5] and to pay royalties on the total volume of Piocelan products sold during the ten-year life of the license.

The parties' dispute in this case is centered around Article XI of the License Agreement. Article XI is titled "TERM AND TERMINATION." It provides that

> This Agreement shall ... remain in full force and effect for a period of ten (10) years from the date of exercise by [ARCO] of the option in Paragraphs 5.2 and 5.3, unless this Agreement is terminated earlier as provided in Paragraph 5.6 or ARTICLE IX. Upon payment of the Lump Sum Payment and Running Royalties due under Paragraph 6. 1, [ARCO] shall have a fully paid-up right and license to use and sublicense [the Piocelan process and Piocelan products] in any of its United States and/or Canadian plants and to sell [Piocelan products] produced anywhere in the world (subject to paragraph 5.4).

## C.

In 1985, ARCO exercised its option to acquire a ten-year license as provided in Paragraph 5.4 of the License Agreement. In 1996, NOVA acquired ARCO and became a party to the License Agreement by assignment.

In 2002, NOVA began selling Piocelan products in the Asian market. It now sells these products, under the trade name AR-CEL, in China, Hong Kong, the Philip-

---

**5.** The earlier payment of $100,000 to acquire to the option was credited towards this total.

pines, Singapore, Vietnam, and Malaysia. When Sekisui objected, NOVA sought a declaratory judgment that the License Agreement did not prohibit these sales. The District Court granted summary judgment in favor of NOVA, finding that the License Agreement had no continuing force after 1995, that the agreement never prohibited NOVA from selling Piocelan products in Asia, and that Sekisui's proposed interpretation raised serious questions about the legality of the contract.

## II.

The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. Both parties agree that Pennsylvania law governs interpretation of the License Agreement.[6]

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment *de novo*. *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir.1993). In doing so, we need not limit our analysis to the grounds stated in the District Court's decision. *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court."); *Cospito v. Heckler*, 742 F.2d 72, 78 n. 8 (3d Cir.1984) (same).

## A.

■ In Pennsylvania, "[t]he paramount goal of contract interpretation is to determine the intent of the parties." *Garden State Tanning, Inc. v. Mitchell Mfg.*

*Group, Inc.*, 273 F.3d 332, 335 (3d Cir. 2001) (citing *Meeting House Lane, Ltd. v. Melso*, 427 Pa.Super. 118, 628 A.2d 854, 857 (1993)). The strongest manifestation of that intent is the wording of the agreement itself. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980) (applying Pennsylvania law). "[T]he language used in a contract is normally to be given its ordinary meaning in the absence of evidence of some special meaning." *Light v. Miller*, 303 Pa.Super. 527, 450 A.2d 51, 53 (1982) (citing 8 Pennsylvania Law Encyclopedia § 145).

■ "[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982) (emphasis omitted). On the other hand, where the language of a contract negotiated between equal parties is ambiguous, "extrinsic or parol evidence [may] be considered to determine the intent of the parties." *Ferrer v. Trustees of the Univ. of Pa.*, 573 Pa. 310, 825 A.2d 591, 608 (2002) (citation omitted).

The Pennsylvania Supreme Court has set forth the following definition of "ambiguity":

Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained

---

**6.** The License Agreement provides that "[t]he validity, interpretation and performance of this Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, United States of America." (License Agreement ¶ 17.1.)

contrivance in order to find an ambiguity.

*Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999) (internal citations and quotation marks omitted).

## B.

Somewhat paradoxically, Sekisui, the licensor, argues that it granted NOVA a permanent license to sell and use its technology. NOVA, the licensee, argues that the license had a defined term of ten years and expired thereafter.

Sekisui maintains that the License Agreement provided NOVA an opportunity to obtain two separate licenses to use its Piocelan process. The first is the ten-year license set forth in Paragraph 5.4. The second is the "fully paid-up" license described in Article XI. According to Sekisui, the "fully paid-up" license only came into being "upon payment of the ... Running Royalties due under Paragraph 6.1." Thus, the "fully paid-up" license must refer to a license granted only after ten years of royalty payments.

Because the contract does not specify a termination date for the "fully paid-up" license described in Article XI, Sekisui contends that it lasts indefinitely. Sekisui also maintains that by incorporating Paragraph 5.4, the "fully paid-up" license prohibits NOVA from selling Piocelan products in the listed Asian countries. Thus, Sekisui insists that NOVA is indefinitely barred from selling Piocelan products in the listed countries.

Conversely, NOVA argues that the License Agreement grants one license lasting only ten years. Although the "fully paid-up" license exists "upon payment of the ... Running Royalties," NOVA maintains that this simply means the ten-year license was contingent on payment of any royalties that had accrued to date. Thus, the License Agreement has no terms that extend beyond the ten-year license period.

Further, NOVA asserts that while the License Agreement did not affirmatively grant NOVA rights to sell in Asian countries, it also does not bar NOVA from selling in those countries. According to NOVA, a license is a grant of rights that the licensee would not otherwise have, and therefore the exclusion of Asian countries from the scope of the license is not an affirmative bar on selling in these countries. Thus, if NOVA would otherwise have a legal right to sell Piocelan products in Asia absent the License Agreement, then the license cannot deprive it of that right. Accordingly, the agreement does not impede NOVA from selling Piocelan products in Asia.

## C.

### 1.

First, we turn to whether the Article XI "fully paid-up" license refers to the ten-year Paragraph 5.4 license, or a separate license. We find that there are two reasonable interpretations of Article XI. First, as Sekisui contends, Article XI could mean that the parties intended to grant NOVA a continuing license to manufacture and sell Piocelan products at the end of the ten-year period of running royalties, in other words when the payments required by Article VI were "fully paid-up." On the other hand, as NOVA contends and the District Court found, the second sentence of Article XI could be intended simply to signify what was necessary to maintain the Paragraph 5.4 license during its ten-year term.

There is considerable linguistic and structural support for each interpretation. As to the first interpretation, the language of the second sentence of Article XI is not

identical to the language of Paragraph 5.4. Paragraph 5.4 provides that:

> Following the payment by [ARCO] to Sekisui of [the $500,000 lump sum payment] under Paragraph 6.1(a)(3), an exclusive license with the right to sublicense is automatically granted to [ARCO] during the term of this Agreement under all SEKISUI PO TECHNOLOGY, SEKISUI PX TECHNOLOGY, SEKISUI COLORED BEAD TECHNOLOGY, PATENT RIGHTS, COLORED BEAD PATENT RIGHTS to produce, sell and use all PRODUCTS and other resinous materials in the LICENSED TERRITORY. Moreover, [ARCO] and its sublicensee shall have the right to sell PRODUCTS and other resinous materials in all countries of the world except in the following countries: Japan, Korea, China, Hong Kong, Philippines, Vietnam, Thailand, Malaysia, Singapore, Indonesia, India and Pakistan.

In contrast, the second sentence of Article XI, provides that NOVA shall have a license "upon payment of the [$500,000] Lump Sum Payment *and* Running Royalties due under Paragraph 6.1." Thus, the Paragraph 5.4 license begins with a lump sum payment. The Article XI license on the other hand requires the payment of both the lump sum payment and running royalties. Further, the Paragraph 5.4 license is exclusive in the United States and Canada, and non-exclusive elsewhere. The Article XI license is not exclusive.

In addition, Sekisui's argument that Article XI creates rights and obligations beyond the ten-year license is consistent with the License Agreement's overall structure; the License Agreement conveys a shifting array of licensing arrangements rather than a single discrete license. First, the License Agreement provides a three-year exclusive domestic license during the option period. Then, it provides the Paragraph 5.4 exclusive domestic license, and non-exclusive foreign license. In addition, the License Agreement conveys "an exclusive license to use the trademark 'Piocelan' in the [United States and Canada] for the sale of [Piocelan-related products]." (License Agreement ¶ 15.1.) Since the License Agreement has at least three separate licensing provisions, it becomes more reasonable to read Article XI as doing more than reiterating an earlier license.

On the other hand, the first sentence of Article XI provides that "this Agreement" shall have a ten-year term from the date ARCO exercised its option.[7] The second sentence of Article XI could be read to clarify what was meant by "this Agreement" and to explain that, to maintain its ten-year license, ARCO was required to stay up-to-date on any accrued royalty payments—that is to stay "fully paid-up."

Because there are two linguistically possible, reasonable interpretations of Article XI, it is ambiguous. However, as set forth below, we find that it is not necessary to resolve this ambiguity.[8]

---

7. NOVA argues that its reading is the only reasonable interpretation of "fully paid-up license" because the alternative is a contract with a perpetual duration, a result it maintains is disfavored by Pennsylvania law. *See Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 n. 5 (1986) (discussing presumption against perpetual contracts in context of coal mining lease). This rule has been followed in a number of subsequent cases concerning coal mining rights. *See,*

*e.g., Leet v. Vinglas*, 366 Pa.Super. 294, 531 A.2d 17, 21 (1987). However, the meaning of Article XI and the duration of any license conveyed by this provision are separate issues, and we need not decide the "perpetual duration" question posed by NOVA.

8. Because we find that it is possible to resolve the dispute between the parties without resolving the ambiguity in Article XI, we need not consider the extrinsic evidence of the par-

## 2.

■ We need not resolve any ambiguity in Article XI, because—even if the "fully paid-up" license is indeed a separate license enduring past the ten year term of the License Agreement—we conclude that the "fully paid-up" license clearly expired along with Sekisui's intellectual property rights in the Piocelan process. Because Sekisui does not have continuing intellectual property rights in Piocelan, the License Agreement has no continuing force.

The License Agreement does not explicitly fix a definite duration for the "fully paid-up" license. Relying on *Rossmassler v. Spielberger*, 270 Pa. 30, 112 A. 876 (1921), Sekisui argues that the "fully paid-up" license must therefore be permanent. However, Pennsylvania courts hold that "where there is no express provision in the contract as to its duration or termination the intention of the parties in that regard is ... determined from the surrounding circumstances and by an application of a reasonable construction to the agreement as a whole." *Inst. for Sci. Info., Inc. v. Gordon and Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1009 n. 8 (3d Cir.1991) (citation and internal quotation marks omitted) (applying Pennsylvania law); *see also Rosenfeld v. Rosenfeld*, 390 Pa. 39, 133 A.2d 829, 834 (1957) ("When a contract is silent on its duration, parol evidence is always admissible to show the circumstances surrounding the execution of the contract, the situation of the parties, the objects they apparently had in view, and the nature of the subject matter of the agreement, to show whether the agreement was to endure for a reasonable time or for some particular period."); *Price v.*

*Confair*, 366 Pa. 538, 79 A.2d 224, 226 (1951) ("[C]ontracts which do not fix a definite time for the duration of the relationship which they create are sometimes construed as providing for a reasonable time or some particular period inferred from the nature and circumstances of the undertaking."). For example, in *Thomas v. Thomas Flexible Coupling Co.*, the Pennsylvania Supreme Court applied this rule to determine that a patent license agreement terminated with the expiration "of the life of the patents which constituted their subject matter." 353 Pa. 591, 46 A.2d 212, 215 (1946).

■ Indeed, even *Rossmassler* stands for the proposition that, absent an explicit term, the duration of a contract is to be determined based on its subject matter. The Pennsylvania Supreme Court noted in *Rossmassler* that "the intention of the parties to an agreement that it should be perpetual and without limit as to duration could not be more properly expressed than by silence as to any time limit or power of revocation." 112 A. at 880. However, the ultimate holding of that case was that "the courts will always deduce the term from the nature of the subject-matter if it is at all possible so to do." *Id.*

In evaluating the duration of the claimed "fully paid-up" license, we start with the subject matter of the License Agreement. The subject matter of the contract is Sekisui's "patent rights and valuable technical information of a confidential nature relating to the expandable [Piocelan] resins." (License Agreement, preface; App. at 52.) Thus, we must consider the duration of the patent rights and trade secrets involved in the License Agreement.[9]

ties' intent. However, we do note that the extrinsic evidence is equivocal and lends some support to each proposed interpretation.

9. The License Agreement also permitted NOVA to use Sekisui's Piocelan trademark. Sekisui does not argue that this was the basis of the "fully paid-up" license, and in any

Patents have a defined duration, *see* 35 U.S.C. § 154, and the District Court found that Sekisui's patents have expired.[10] If the License Agreement were only based on patent rights, it is implicit that it would have terminated with the expiration of those patent rights. *See Thomas*, 46 A.2d at 215; *cf. Brulotte v. Thys Co.*, 379 U.S. 29, 33–34, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) (holding that contract to extract royalty payments after patent has expired is unenforceable based on federal patent law).[11]

■ However, determining the duration of the License Agreement is complicated by the trade secret rights Sekisui claims were at the heart of the agreement. Unlike a patent monopoly, trade secret protections are theoretically unlimited in duration, lasting as long as the information remains a trade secret. Factors relevant to determining whether information is a trade secret include the extent to which it is known outside the owner's business; the extent to which it is known by employees and others within the owner's business;

the extent of measures taken to guard the secrecy of the information; the value of the information to competitors; the effort or money expended to develop the information; and the ·ease or difficulty with which it could be properly acquired or duplicated.[12] *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir.1985). Four of these six factors are directed at gauging the secrecy of the information because "[t]he most important characteristic of a trade secret is that it is in fact secret." James Pooley, Trade Secrets § 4.04 (2009).

■ Under the License Agreement, Sekisui shared its confidential technical information with NOVA. However, not all disclosures will destroy a trade secret. For example, a trade secret owner may license its secret information without losing legal protections. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 486, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (noting that trade secret protections permit a trade secret holder to share his discoveries with a manufacturer in exchange for a binding legal obligation to pay a license fee

---

event, NOVA markets the products under its own trademark.

**10.** Although neither party presented evidence of particular patents, any patent in effect in 1983 would have expired by 2002. *See* 35 U.S.C. § 154. If Sekisui believes that it has continuing intellectual property to which the License Agreement applies, it should have presented evidence to that effect before the District Court. We note that Sekisui has not claimed that NOVA's Asian sales infringe any of its patent rights. Further, at oral argument Sekisui repeatedly emphasized that the basis for its argument is the trade secrets it conveyed pursuant to the License Agreement, rather than any patent rights.

**11.** Although the economic reasoning in *Brulotte* has been criticized, it remains good law and binding precedent. *See, e.g., Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1017–18 (7th Cir.2002).

**12.** Trade secrets are now defined by 12 Pa. Cons.Stat. Ann. § 5302 as:

> Information ... that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by; other persons who can obtain economic value from its disclosure or use. (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Pennsylvania adopted the Uniform Trade Secrets Act in 2004. It is applicable to misappropriations occurring after this date, but not to continuing misappropriation that began earlier. 2004 Pa. Legis. Serv. Act 2004–14, § 4. The standard set forth above in text derives from Comment b to Section 757 of the Restatement of Torts. Pennsylvania courts continue to look to this standard to determine whether information constitutes a trade secret under the statute. *See, e.g., Lukes v. Dep't of Pub. Welfare*, 976 A.2d 609, 625–26 (2009).

and to protect the secret); *see also* Pooley, Trade Secrets § 8.06. Trade secret licenses are generally "rental" agreements, under which the trade secret holder retains ownership. Pooley, Trade Secrets § 8.06. Nonetheless, under the terms of the License Agreement, after 1995, NOVA was not required to maintain the secrecy of any information it had acquired from Sekisui. (*See* License Agreement art. IV.) Thus, the information lost its trade secret status, at least between Sekisui and NOVA, in 1995. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information ... his property right is extinguished." (citing 1 R. Milgrim, Trade Secrets § 1.01[2] (1983))).

The fact that Sekisui did not seek to protect its purported trade secrets after 1995 seems inconsistent with the notion that trade secrets, rather than patent rights, were at the heart of the License Agreement. If Sekisui's "know-how" was so essential to producing products based on its Piocelan technology, it is hard to understand why either party would want to risk that information becoming public. Nonetheless, for the purposes of this appeal, we will assume that, as the License Agreement itself asserts, conveying access to trade secrets was a central purpose of the agreement.

■ The expiration of NOVA's obligation to maintain the secrecy of Sekisui's technical information does not necessarily resolve the duration of the "fully paid-up" license. Trade secret licenses may endure even where the trade secret itself is destroyed by general disclosure. *See Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 266, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979); *Warner–Lambert Pharm. Co. v. John J. Reynolds, Inc.,* 178 F.Supp. 655,

665–66 (S.D.N.Y.1959), *aff'd* 280 F.2d 197 (2d Cir.1960) (per curiam) (adopting District Court opinion).

In *Aronson,* an inventor agreed to disclose her design for a new type of keyholder in exchange for royalty payments; higher payments if she was able to obtain a patent and lower payments otherwise. 440 U.S. at 259, 99 S.Ct. 1096. Both parties understood that the design would "cease[ ] to have any secrecy as soon as it was first marketed," and that it was unclear whether the keyholder was patentable. *Id.* at 266, 99 S.Ct. 1096. The Supreme Court held that state law, rather than patent law, determined whether the agreement was enforceable, effectively affirming that district court's decision that the manufacturer had a continuing obligation to pay royalty payments despite the inventor's failure to obtain a patent and the loss of the design's trade secret status at the beginning of the agreement. *Id.* at 262–66, 99 S.Ct. 1096.

*Warner–Lambert Pharmaceutical Co.* concerned the license to manufacture Listerine. 178 F.Supp. at 657. For over 75 years, Warner–Lambert and its predecessors made royalty payments for the once secret formula for Listerine. *Id.* The original license called for royalty payments to be paid "for each and every gross of said Listerine hereafter sold." *Id.* at 658. However, Warner–Lambert tired of making the royalty payments when the "secret formula" became common knowledge, published in a number of public sources. *Id.* at 659–60.

The *Warner–Lambert* court acknowledged that intellectual property license agreements generally expire with the life of the intellectual property. *Id.* at 664. Nonetheless, the court found that Warner–Lambert was obligated to continue making the payments as long as it made a product based on the original formula. *Id.* at 665

(holding that "one who acquires a secret formula or a trade secret through a valid and binding contract ... [may not] escape from an obligation to which he bound himself simply because the secret is discovered by a third party or by the general public."). In doing so, the court distinguished the public policy concerns implicated by trade secrets and other types of intellectual property. The court focused on the fact that in "patent and copyright cases the parties are dealing with a fixed statutory term and the monopoly granted by that term," while in trade secret cases the life span of the trade secret cannot generally be known. *Id.* Thus, "[o]ne who acquires a trade secret or secret formula takes it subject to the risk that there be a disclosure." *Id.* at 666.

As a result, on its own, the subject matter of the License Agreement does not determine the duration of the "fully paid-up" license. Accordingly, we turn to other aspects of the License Agreement. Unlike the agreements in *Warner–Lambert* and *Aronson*, the terms of the License Agreement in this case do not suggest that it has any ongoing vitality after the termination of Sekisui's intellectual property rights.

In both *Aronson* and *Warner–Lambert*, the courts focused on aspects of the agreements that evinced an intent to create ongoing obligations after the life of the relevant intellectual property. In *Aronson*, the parties understood that the relevant trade secrets would be destroyed as soon as the product was manufactured. 440 U.S. at 259, 99 S.Ct. 1096. Nevertheless, the parties explicitly agreed to ongoing royalty payments even if a pending

patent application failed. *Id.* Further, the parties clearly delineated the consideration applicable to the patent-license portion of the agreement and the trade-secret license portion of the agreement. *Id.* In *Warner–Lambert*, Warner–Lambert agreed to ongoing royalty payments as long as it continued to manufacture Listerine, instead of setting a fixed end date or otherwise limiting its obligation to continue paying. 178 F.Supp. at 660. In both cases, the Court found that the licensor agreed to disclose secret information to a manufacturer in exchange for ongoing consideration.

Here, in contrast, nothing in the License Agreement suggests that the parties intended any ongoing obligations with respect to trade secrets after the 1995 termination of NOVA's obligation to maintain the secrecy of Sekisui's technical information. While Sekisui argues that it only agreed to disclose its trade secrets and to train NOVA personnel in exchange for NOVA's ongoing promise to stay out of Asia (in addition to lump sum and royalty payments), the terms of the License Agreement belie this argument. The Asia exception appears as a limitation on the scope of NOVA's rights under Sekisui's intellectual property, rather than as an independent restriction or as consideration for trade secret disclosures.[13]

Further, Sekisui disclosed its trade secrets during the option period. If NOVA had chosen *not* to exercise its option to acquire a ten-year license to manufacture Piocelan products, Sekisui's trade secrets would have been protected for only five years after NOVA rejected the license. In

---

**13.** Because the Asia exception is a limitation on a license to use certain intellectual property, it only prohibits NOVA from using that intellectual property to sell Piocelan products in Asia. It does not prohibit NOVA from selling Piocelan products in Asia if NOVA's authority for doing so is independent of the License Agreement and those intellectual property rights. Once Sekisui's patents expired and the secrecy obligations terminated, NOVA had such an independent right to sell Piocelan products—the same right held by the general public.

this circumstance, the Asia exception never would have come into force at all; NOVA would have been undisputably free to make use of Sekisui's trade secrets after five years and to market Piocelan products anywhere in the world as soon as Sekisui's patents expired. Thus, if it was intended as consideration at all, the Asia exception could only have been consideration for a license under Sekisui's patent rights and to use Sekisui's trade secrets during the period they remained protected, rather than for the initial disclosure of those trade secrets.

Finally, none of the extrinsic evidence supplied by the parties suggests that they intended the Asia exception to be a stand-alone provision, or any terms of the License Agreement to survive the expiration of Sekisui's patent rights and NOVA's secrecy obligations with respect to the trade secrets.

Considering the subject matter and language of the License Agreement, and its surrounding circumstances we find that the parties could not have intended the "fully paid-up" license to survive the expiration of Sekisui's intellectual property.

### III.

For the reasons stated above, we will affirm the judgment of the District Court.