Wyeth Pharmaceuticals, Inc., a        :
Delaware Corporation, successor       :
to Wyeth Laboratories Inc., a         :
New York Corporation,                 :
    Appellant     :
        :
   v.                   : No. 2116 C.D. 2014
        : Argued: October 5, 2015
Borough of West Chester and           :
Pfizer Inc.                           :


BEFORE: HONORABLE BERNARD L. McGINLEY, Judge
     HONORABLE MARY HANNAH LEAVITT, Judge
     HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION
BY JUDGE LEAVITT        FILED: November 5, 2015


   Wyeth Pharmaceuticals, Inc. appeals an order of the Court of Common Pleas of Chester County that denied its request for a declaratory judgment that its contract with the Borough of West Chester had terminated and denied its request for a refund of invoices it had paid after the contract's termination. Instead, the trial court granted the Borough of West Chester $1,719,235.27 on its counter-claim for breach of contract. For the reasons set forth below, we reverse and remand.

## Background

   This case concerns a contract between Wyeth and the Borough of West Chester relating to the reconstruction of a Borough wastewater treatment plant known as the Goose Creek Plant. In the 1970's, the Pennsylvania Department of Environmental Resources ordered the Borough to rebuild the Goose

Creek Plant because it had been repeatedly cited for exceeding its discharge limits. At the time, Wyeth, which began operating a penicillin manufacturing facility in the Borough in the 1950's, was one of the largest industrial dischargers of wastewater in the Borough. The Borough obtained the agreement of Wyeth and two other industrial dischargers to share in the costs of the upgrade to the Goose Creek Plant. The terms of the agreement between Wyeth and the Borough were set forth in a written contract (Agreement) that was executed on July 31, 1984.

Under the Agreement, Wyeth promised to contribute both to the capital costs of upgrading the Goose Creek Plant and to its operational and maintenance expenses. The Agreement recited the following:

> Significant portions of the Costs of the Project ... are attributable to equipment and facilities necessary to treat the companies' Sewage. Therefore, the companies should pay their share of the principal and interest on money borrowed to finance the Costs of the Project, including costs and expenses of financing, and *the companies should also pay their share of the annual Operating and Maintenance Expenses attributable to the treatment of the companies' waste*.

Agreement, "Background of Agreement," at 2 (hereinafter "Background Clause"); Reproduced Record at 985a (R.R. ___) (emphasis added).[1] A 1976 letter from Wyeth's Vice President to the Borough Solicitor explained that "[t]he intended period of use of the treatment facilities by Wyeth Laboratories Inc. shall be for the life of the treatment works or as long as Wyeth Laboratories shall remain in the Borough of West Chester." R.R. 1067a.

---

[1] "Companies" refers to the three industrial dischargers that executed a similar agreement. At least one, Sartomer, which is a specialty chemical company, continues to operate in the Borough.

2

Under the final terms, Wyeth agreed to cover 49.2% of the capital costs of upgrading the Goose Creek Plant and 49.2% of the plant's Operational and Maintenance Expenses.[2]  Agreement, ¶¶4, 8; R.R. 995a, 998a.  The Agreement divided the Operational and Maintenance Expenses into two categories:  variable costs and fixed costs.  Variable costs were based upon Wyeth's volume and type of wastewater and included such items as treatment chemicals and electricity.  Fixed costs fell into seven categories:  (1) labor (including benefits), (2) administration, (3) telephone, (4) electric, (5) fuel, (6) materials and supplies and (7) maintenance and repair. *Id.*

Wyeth discharged wastewater into the reconstructed Goose Creek Plant from 1988 until the mid-2000s.  In 2004, Wyeth ceased all operations at its West Chester pharmaceutical facility, and, by February 2005, had completely decommissioned the site.  It has not discharged wastewater since then.  In 2006, Wyeth razed all structures at its West Chester facility, abandoned its sewer connection and has not used the property since.  Attempts to sell the property have failed, and it remains undeveloped.

In 1997, Wyeth completed the payment of the capital costs required under the Agreement.  When Wyeth stopped using the Goose Creek Plant, the Borough stopped sending it invoices for variable costs.  The Borough agrees that Wyeth has fully discharged its contractual obligations for the capital costs and variable costs.  The parties disagree on Wyeth's continuing liability for the fixed

---

[2] Wyeth's share was calculated based on projected waste flows and characteristics at the time the contract was executed, as set forth in Schedule A to the Agreement.  The Agreement originally assigned a 51.1% share to Wyeth, and was amended in May 1985 to reduce the share to 49.2%.  R.R. 1005a; R.R. 1015a.

costs portion of the Operational and Maintenance Expenses of the plant as provided in the Agreement.

Although Wyeth has not used the Goose Creek Plant since 2005, the Borough's invoices to Wyeth for fixed costs have steadily increased, as shown by the following table:

| Year | Total Charge to Wyeth |
|------|----------------------|
| 2005 | $572,858 |
| 2006 | $657,119 |
| 2007 | $665,751 |
| 2008 | $705,328 |
| 2009 | $733,944 |
| 2010 | $779,783 |
| 2011 | $808,135 |
| 2012 | $837,055 |
| 2013 (3 quarters) | $592,319 |

Wyeth Brief at 10; R.R. 1532a-1664a; R.R. 2113a-2122a. Wyeth paid these invoices through 2011. On December 8, 2011, Wyeth gave notice to the Borough "of our intent to cease paying the fixed costs of Operating and Maintenance Expenses or any other expenses of the [Goose Creek Plant] and to terminate the Agreement." R.R. 1109a. Wyeth did not pay the Borough's invoices for 2012 and 2013.

On April 11, 2012, Wyeth filed a lawsuit against the Borough of West Chester. It sought a declaratory judgment that the Agreement terminated in 2006 when it severed the sewage connection or, in the alternative, 2011, when it formally notified the Borough of the termination. The complaint also sought a refund of all fixed costs Wyeth has paid since 2006. Alternatively, it sought a recomputation of the fixed cost invoices to delete those charges that, in Wyeth's

4

view, exceeded what was required to operate and maintain the Goose Creek Plant, assuming the Agreement had continued in force after 2006.

The Borough counterclaimed, seeking a declaratory judgment that the Agreement remained in effect, that its charges for fixed costs were properly computed and that Wyeth was liable for the unpaid 2012 and 2013 invoices. The Borough sought monthly interest of 1½% on the unpaid invoices under authority of its local sewer ordinance. WEST CHESTER BOROUGH CODE (App. E) §89-12(B).[3]

---

[3] It states, in relevant part, as follows:

> *All sewer rents not paid within 21 days of the date of the bill shall be deemed to be delinquent and shall be subject to a penalty of 1½% per month.* All delinquent sewer rents, together with interest, penalties, charges and costs thereof, shall constitute a municipal claim against the property or properties served by the sewer service from the date the same first became due and payable. If such sewer rents, penalties and charges are not timely paid, the Borough shall file a municipal lien against the property served pursuant to the procedure established in the Pennsylvania Municipal Lien Law and in §89-14 herein, and such lien shall be collected in the manner provided for by law for the filing and collecting of such municipal liens. The Borough is further authorized to collect reasonable attorneys' fees that it incurs in the collection of any delinquent sewer accounts in the amount specified in §89-14 herein. In addition, the Borough may collect all delinquent sewer rents, penalties, interest and charges, including attorneys' fees, by referring such delinquent claims to a collection agency, by filing an action in assumpsit, or in any other manner or by any proceeding otherwise provided by law. Any fees that the Borough incurs in exercising its legal remedies shall be added to the amount of the delinquent account. All of the Borough's remedies shall be cumulative.

WEST CHESTER BOROUGH CODE (App. E) §89-12(B) (emphasis added).

When Wyeth stopped paying the fixed cost invoices, the Borough issued past-due notices stating that under "the sewer agreement between the Borough and [Wyeth], along with the Borough's sewer ordinance, any invoice not paid within thirty days, will be subject to a penalty of 1.5%." R.R. 2119a. Wyeth notes that Paragraph 10 of the Agreement provides that the Borough will not apply a penalty where Wyeth "makes a timely request for further information or clarification ...." Agreement, ¶10.

5

At the bench trial, Wyeth produced evidence that the Borough's yearly invoices for fixed costs have been roughly equivalent to the amounts the Borough's Sewer Department has transferred each year to the Borough's General Fund. It also produced a 2012 document prepared by the Borough Manager stating that should the Borough sell its sewer system, it would need a profit of $20 million because the Sewer Department transfers $800,000 *per annum* to the General Fund. R.R. 1862a. The Borough apportioned the "administration" charges equally between the Goose Creek Plant and the Borough's other plant, the Taylor Run Plant, without regard to the actual Borough services provided to either plant. Wyeth's evidence showed that included in the "administration" portion of the fixed cost invoices were expenses as varied as fueling vehicles in the police department and funding a new HVAC system for the municipal building, neither of which had anything to do with operating and maintaining the Goose Creek Plant. Wyeth also showed that the Borough's fixed cost invoices included charges for labor associated with pumping stations that did not serve the Goose Creek Plant. Finally, Wyeth presented evidence that the Borough overstaffed the Goose Creek Plant.

The Borough responded with expert testimony that the upgrade to the Goose Creek Plant was required in order to treat Wyeth's waste. This included the purchase of equipment that must be maintained regardless of whether Wyeth continues to discharge waste. The Borough also presented evidence that the fixed cost invoices sent to Wyeth had been calculated in the same manner since the late 1980s. Thus, for two decades Wyeth had agreed that the Borough's methodology was consistent with the Agreement. The Borough explained that the transfers from the Sewer Department to the General Fund covered the cost of services provided to

6

the Sewer Department by other Borough departments and were calculated in accordance with generally accepted accounting principles. The Borough sought breach of contract damages equal to the amount of the unpaid invoices plus interest.

On July 14, 2014, the trial court entered an order that found against Wyeth on all claims, and found in the Borough's favor on its counterclaim for damages.[4] The trial court awarded the Borough $1,719,235.27 in damages plus "interest at the legal rate." Trial Court Order at 2. Wyeth filed a post-trial motion, which the trial court denied. On November 19, 2014, Wyeth appealed.

In response to Wyeth's Rule 1925(b) statement, the trial court filed a Rule 1925(a) opinion. The opinion concluded that Wyeth did not establish that the Agreement had terminated as of the date of trial. The trial court acknowledged "that some of the Borough's charges were not support[ed] by the contract" and, thus, reduced the Borough's claim for damages. Trial Court §1925(a) op. at 9. However, the trial court declined to specify the amount of the overcharge or to provide a breakdown of its damage award and basis for pre-judgment interest, concluding that the issue was waived by Wyeth. Nevertheless, the trial court explained that the evidence supported "an intelligent estimation" of the Borough's damages and that the Borough "was entitled to pre-judgment interest as a matter of law." Trial Court §1925(a) op. at 10.

---

[4] The trial court denied the Borough's request for damages for future unpaid invoices as "too speculative." Trial Court Order at 2 n.2. However, the trial court held open the possibility of such an award in the future, stating:

> If it becomes clear that these payments will not be made and that quarterly litigation will be required, the time may come when .... the future damages as the Borough seeks in this litigation will become proper and appropriate.

*Id.*

7

## Issues on Appeal

On appeal, Wyeth seeks a reversal of the trial court's order and entry of judgment in Wyeth's favor. It raises three issues.[5]

First, Wyeth contends that the trial court erred because the Background Clause of the Agreement supports a termination in 2006, when Wyeth abandoned its sewer connection to the Goose Creek Plant. If not, then the Agreement was a contract of indefinite duration and, as such, terminable at will by either party. Wyeth's notice of termination to the Borough on December 8, 2011, ended the Agreement.

Second, Wyeth contends that the trial court erred because the Borough breached the Agreement and was unjustly enriched when it collected hundreds of thousands of dollars in charges from Wyeth that were not authorized by the Agreement or required to operate and maintain the Goose Creek Plant.

Third, the trial court erred in awarding damages to the Borough because the Agreement did not authorize the Borough's overcharges, let alone the interest award. Additionally, the trial court erred because the Borough's sewer ordinance did not authorize an award of interest or penalty, assuming Wyeth's payments of the fixed cost invoices were not timely.

---

[5] The trial court's findings of fact are entitled to deference, so long as they are supported by the evidence of record. *In re Condemnation by Urban Redevelopment Authority of Pittsburgh*, 913 A.2d 178, 183 (Pa. 2004). Construction of a contract or ordinance is a question of law subject to a *de novo* standard of review on appeal. *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009). On questions of law, this Court's scope of review is plenary. *Hospital & Healthsystem Association of Pennsylvania v. Department of Public Welfare*, 888 A.2d 601, 607 n.12 (Pa. 2005).

8

# I. Duration of the Agreement

In its first, and central, issue, Wyeth argues that it has satisfied all of its contractual obligations under the Agreement and, thus, the Agreement has terminated. The Agreement obligated Wyeth to pay a share of the upgrade costs as well as its share of "the annual Operating and Maintenance Expenses *attributable to the treatment of [Wyeth's] waste.*" R.R. 985a (emphasis added). Once Wyeth paid for the capital costs and stopped producing waste, its obligations under the Agreement ceased. Recognizing that the Agreement does not contain an express termination provision or a duration clause, Wyeth argues that it is terminable at will by either party in accordance with common law contract principles. Finally, it contends that even assuming, *arguendo*, that there is a question about whether the Agreement extended beyond the point where Wyeth no longer produced waste, evidence contemporaneous with the execution of the Agreement clarifies that it would end when Wyeth closed its facility.

The Borough responds that the Agreement obligated Wyeth to pay the fixed costs portion of Operating and Maintenance Expenses indefinitely. In support it cites Paragraph 9, which states:

> *In no event*, however, shall Company be charged and pay less than its share of the fixed costs of the Operating and Maintenance expenses as described in paragraph 8.

R.R. 998a (emphasis added). The Borough argues that Paragraph 9 carries far more weight than the Background Clause cited by Wyeth. The Borough also finds support for the perpetual nature of the Agreement in Paragraph 19, which states:

> This Agreement shall be binding upon the parties hereto and their respective successors and assigns. Covenants and agreements contained in this Agreement on behalf of Company shall constitute and shall be construed as covenants which shall

9

attach to, run with and burden the land of Company upon which the Company Plant is located ....

R.R. 1003a. Because the Agreement must be construed as running with the land, it has no durational limit. Indeed, Wyeth remained liable for its contractual obligations notwithstanding its "conveyance of all or part of the land of Company upon which Company's Plant is located ...." Agreement, ¶19; R.R. 1004a.

We address the contract construction arguments *ad seriatim*.

### a. Language in Background Clause and Paragraph 9

To begin, we reject the Borough's argument that the preamble to the Agreement is irrelevant.[6] A contractual preamble can be a "reliable indicator of intentions of the parties." *Mercy Health System of S.E. Pa. v. Metro. Partners Realty LLC,* No. 3046 Nov. Term 2001, 2005 WL 957722, at *5 (Phila. Ct. Com. Pl. Mar. 6, 2005) (emphasis added) (citing *Pritchard v. Wick*, 178 A.2d 725 (Pa. 1962)). A background recital may not contradict a substantive provision of the contract, but it nevertheless "will be looked to in construing the contract." *Cain Rest. Corp. v. Carrols Corp.*, 273 F. App'x 430, 434 (6th Cir. 2008). In *Pritchard*, our Supreme Court expressly relied upon a recital clause to ascertain the circumstances under which one party to an option contract was permitted to exercise the option. *Pritchard*, 178 A.2d at 728. In sum, the Background Clause is relevant to the meaning of the substantive provisions of the Agreement.

We also agree with Wyeth that the recording of the Agreement is not dispositive of the Agreement's duration. The purpose of the recording was to give constructive notice of the Agreement to prospective purchasers of Wyeth's land

---

[6] The trial court did not find the Background Clause irrelevant. Rather, it held that because the Agreement was recorded, it had a duration "in perpetuity." Trial Court §1925(a) op. at 4.

and facility in the Borough. *See* Act of April 24, 1931, P.L. 48, 21 P.S. §357.[7] As Wyeth points out, a 30-year mortgage lien is recorded, but it expires after 30 years. The recording does not extend the duration of the lien. The recording of the Agreement did mean that Wyeth's sale of its penicillin plant would not terminate its outstanding contractual obligations under the Agreement, but the sale of the property never took place.

Paragraph 8 of the Agreement sets up Wyeth's "share of Operational and Maintenance Expenses," detailing the components of variable costs and fixed costs. R.R. 998a. Paragraph 9 then states that "[*i*]*n no event*, however, shall [Wyeth] be charged and pay less than its share of the fixed costs of the Operating and Maintenance Expenses as described in paragraph 8." *Id.*; Agreement, ¶9 (emphasis added). Wyeth argues that Paragraph 9 simply emphasizes that fixed costs and variable costs must be calculated independently of one another. On the other hand, Paragraph 9 can also be read, as argued by the Borough, to mean that Wyeth must pay fixed costs even when it has no obligation for variable costs. The question is whether Paragraph 9 and the Background Clause conflict with each other or can be read together.

---

[7] The statutory provision states:

> Constructive notice as result of recordation.

> The legal effect of the recording of such agreements shall be to give constructive notice to subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements of the fact of the granting of such rights or privileges and/or of the execution of said releases, and the rights of the subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements shall be limited thereby with the same force and effect as if said subsequent purchasers, mortgagees, and/or judgment creditors had actually joined in the execution of the agreement or agreements aforesaid.

21 P.S. §357.

The Background Clause explains that the Agreement's purpose is to require Wyeth to pay "its share" of Operating and Maintenance Expenses "attributable to the treatment of [Wyeth's] waste." This clause can be read harmoniously with Paragraph 9's statement that "in no event" would Wyeth pay less than "its share" of the fixed costs. The "share" refers to the fixed costs attributable to the treatment of Wyeth's waste, as stated in the Background Clause. If Wyeth should shut down its plant for a month while it retrofitted the plant's equipment, for example, it would not have to pay variable costs during that month but would continue to pay fixed cost invoices. However, once Wyeth lost the ability ever again to discharge waste water, its "share" of expenses ceased to exist.

Giving the benefit of the doubt to the Borough, Wyeth could continue to have a "share" if the expenses of operating and maintaining the Goose Creek Plant could be attributed to the maintenance of specialized equipment that was installed solely to treat Wyeth's wastewater. Maintenance would be necessary whether or not Wyeth was still using that specialized equipment. However, this was not proven by the Borough.

The Borough's solicitor at the time, Ross Unruh, testified that "there would be certain fixed O&M costs which would be there regardless of whether Wyeth Laborator[ies'] manufacturing was still there." R.R. 481a. This states the obvious because the Goose Creek Plant treats waste generated by 10,000 individuals in two municipalities, two industrial users, numerous businesses, a private septic hauler and West Chester University. R.R. 236a, 237a, 277a and 1683a. The Borough did not offer evidence that it incurred any expenses attributable to equipment purchased for the specific purpose of treating Wyeth's waste. Indeed, Borough Manager Ernie McNeely and Borough CFO Douglas

12

Kapp acknowledged that the Borough does not know "how much more [the Goose Creek Plant] cost[s] to operate than a plant that was not designed to handle industrial discharges from Wyeth." R.R. at 4061a. They also acknowledged that the Borough does not have "an order of magnitude on" the allegedly heightened costs of treating Wyeth's waste. *Id.* at 4062a. Finally, they acknowledged that the Borough does not "know one way or the other whether the Goose Creek plant is more expensive to operate today than it would have been if it had been built without having Wyeth in mind as a discharger." R.R. 1937a.

Borough Wastewater Director Kevin Oakes confirmed that whether the Goose Creek Plant costs more to operate as a result of Wyeth's historical need for wastewater treatment "depends on who's running it." R.R. 1919a. He declined to quantify any cost differential because doing so would be "hypothetical." R.R. 1920a. The Borough took the position in post-trial briefing that the "Actual Difference in Costs to Run the Plant Is Irrelevant." R.R. 4190a.

Wyeth, on the other hand, presented evidence that the Goose Creek Plant uses industry-standard treatment technology, R.R. 345a; that "[a]ll the unit processes [at the Goose Creek Plant] are conventional," R.R. 347a; and that "the Fixed Costs [of the Goose Creek Plant] are the same" as the Borough's other plant, the Taylor Run Plant, which has equivalent capacity as the Goose Creek Plant and does not serve any industrial users. R.R. 286a, 1678a.

In sum, the Background Clause and Paragraph 9 can be read together. They do not conflict. They establish that Wyeth must pay its share of Operational and Maintenance Expenses attributable to the treatment of Wyeth's waste. Had the Goose Creek Plant required larger, more or specialized equipment to treat Wyeth's wastewater, the Borough theoretically would continue to incur expenses to

maintain that equipment without regard to whether Wyeth continued to generate wastewater. However, the evidence showed the contrary.

### b. Absence of Duration Clause

The trial court concluded that the Agreement was perpetual. The Borough argues that this was correct because the Agreement does not have a stated duration. Further, the "in no event" clause in Paragraph 9 supports a perpetual duration. Borough Brief at 30. Wyeth responds that contracts without a stated duration will be "construed as providing for a reasonable time or some particular period inferred from the nature and circumstances of the undertaking." *Price v. Confair*, 79 A.2d 224, 226 (Pa. 1951). The Borough acknowledges this principle but argues that it applies only to "services contracts, employment contracts, exclusive sales contracts," and the like. *See* Borough Brief at 25.

In general, a contract for an indefinite period will be construed to be for a "reasonable time or terminable at will unless the intention of the parties can be ascertained." *Major v. Flock Brewing Co.*, 2 Pa. D. & C. 2d. 496, 500 (Lycoming Ct. Com. Pl. 1954). Pennsylvania law disfavors perpetual contracts and, thus, requires a perpetual term to be expressed unequivocally. *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 n.5 (Pa. 1986); *Leet*, 531 A.2d at 21. Absent this expression, for a court "[t]o infer an intent on the part of the contracting parties so drastic and absolute would be unreasonable." *Moravecz v. Hillman Coal & Coke Co.*, 141 A.2d 570, 572 (Pa. 1958) (rejecting a covenant to supply drinking water to an adjacent parcel as creating a perpetual obligation because no express provision to that effect appeared in the operative documents).[8]

---

[8] Wyeth cites the Restatement of Property, which provides as follows:
**(Footnote continued on the next page . . . )**

14

*Price v. Confair*, 79 A.2d 224, is instructive. The case involved a written contract between Confair and the Cloverdale Spring Company, dated January 17, 1941. Confair agreed to furnish Pepsi-Cola to seven named distributors, one of which was Price. In return, Cloverdale gave up its distribution rights in Confair's territory, making Confair the exclusive bottler and distributor of Pepsi-Cola in the Williamsport area. Confair agreed to sell the bottled cola to the seven distributors at 60 cents per case. The set retail price was 80 cents per case. Confair sold Price 100 cases a week at the set price from January of 1941 through July 13, 1945, when it informed Price that it would no longer furnish him bottled cola.

Price sued, contending that because the contract did not specify a duration it was for his life. Presuming his life expectancy would be age 80, Price claimed he was owed his expected profit of 20 cents per case on 100 cases sold per week for 12.11 years.

---

**(continued . . . )**

> A covenant to pay money or provide services in exchange for services or facilities provided to the burdened estate may be modified or terminated if the obligation becomes excessive in relation to the cost of providing the services or facilities or to the value received by the burdened estate; provided, however, that modification based on a decrease in value to the burdened estate should take account of any investment made by the covenantee in reasonable reliance on continued validity of the covenant obligation.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §7.12(2) (2000). The comment explains that such covenants can be modified where there are not "competitive pressures to keep prices reasonable, particularly where the obligation to pay is indefinite in duration or for a long term." *Id.* cmt. a. The Borough incurs no costs attributable to Wyeth's waste yet charges Wyeth over $800,000 annually for a service that Wyeth cannot use. That is an example of Wyeth's costs "becom[ing] excessive in relation to the cost of providing the services or facilities" at issue. *Id.* §7.12(2).

15

The Pennsylvania Supreme Court rejected Price's argument. It held that the

> general rule is that when a contract provides that one party shall render service to another, or shall act as his agent, or shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relationship, the contract may be terminated by either party at will.

*Id.* at 542 (emphasis omitted). However, the Court also stated that in some cases, the intent of the parties may establish that the contract should be "construed as providing for a reasonable time[.]" *Id.*

The Borough argues that *Price* principles apply only to service contracts. The Borough overlooks the fact that the Agreement relates to the Borough's provision of waste treatment services to Wyeth. Further, the presumption of a reasonable duration is a rule of general applicability and not a narrow exception. *See, e.g., Nova Chems., Inc. v. Sekisui Plastics Co.,* 579 F.3d 319, 326 (3d Cir. 2009) (applying presumption to an intellectual property licensing contract).

The principle that a contract without an express duration clause endures for a reasonable period of time or is terminable at will may have been established in the context of commercial sales or lease agreements, but the principle is not limited to those specific types of contracts. The Borough has not identified a single case in which a court found that a contract that called for the payment of money from one party to another continued in perpetuity.[9] Rather, the

---

[9] The Borough cites *Rossmassler v. Spielberger*, 112 A. 876 (Pa. 1921), which involved an obligation to pay an annual priority dividend out of a corporation's profits, which the Borough characterizes as "presumably continu[ing] in perpetuity." *See* Borough Brief at 25. **(Footnote continued on the next page . . . )**

16

law requires that a contract of perpetual duration be provided in an express term, which is nowhere to be found in the Agreement.

### c. Extrinsic Evidence

Although both parties agree that the Agreement is not ambiguous, they each presented extrinsic evidence to support their respective interpretations of the Agreement. Wyeth argues that the contemporaneous evidence it presented supports a 21-year life for the Goose Creek Plant. The Borough argues that its extrinsic evidence showed that Wyeth would have to contribute to the operation of the Goose Creek Plant even if it had no wastewater that required the plant's services.

The 1975 Wastewater Treatment Facilities Plan prepared for the Borough stated that "the planning period [for the upgraded Goose Creek and Taylor Run Plants] should extend 20-years beyond the estimated date of initial system operation." R.R. 1059a. The plan also stated that "[t]he Borough would like to upgrade their present Goose Creek [Plant] to handle existing and future flows to the year 2000." R.R. 1064a. As recently as 2007, an internal sewer rate study commissioned by the Borough acknowledged that "[t]he largest industrial user's agreement runs out in 2007." R.R. 1136a. Wyeth is that industrial user.

In 1976, Wyeth's Vice President Larry Hewlett informed the Borough that Wyeth expected the Agreement to last "for the life of the treatment works or as

---

**(continued . . . )**

*Rossmassler*, however, expressly limited its holding to the duration of the corporation's existence and acknowledged that the obligation would terminate if the corporation was dissolved. 112 A. at 880. The Pennsylvania Supreme Court has itself described *Rossmassler* as endorsing the proposition that "contracts which do not fix a definite time for the duration of the relationship which they create are sometimes construed as providing for a reasonable time or some particular period inferred from the nature and circumstances of the undertaking." *Price*, 79 A.2d at 226.

long as Wyeth Laboratories shall remain in the Borough of West Chester." R.R. 1067a. John Alivernini, who represented Wyeth in negotiations over the Agreement, testified that, "[a]t the outside, it was my understanding the Agreement would end in about 20 years, at the end of the life or the design life of the wastewater plant." R.R. 192.

Wyeth's understanding of the life of the plant was shared by the Borough. In 1979, the Borough's solicitor, Ross Unruh, wrote to Wyeth engineer Robert Herion requesting that Wyeth provide an estimated "maximum discharge to the Goose Creek wastewater facility during the design life of the facility," which he represented to be "twenty-one years after start-up." R.R. 1069a. At trial, Unruh acknowledged that he made that representation to Wyeth as the Borough's official position of the Goose Creek Plant's life. R.R. 491a-492a.

The Borough rejoins that Unruh informed Wyeth that the Borough did not want to get saddled with the costs of operating the Goose Creek Plant, which was designed and constructed to accommodate Wyeth's wastewater needs. R.R. 477a. The protections for the Borough were memorialized in Paragraphs 8, 9, 17 and 19 of the Agreement. The Agreement was recorded so that there would be no dispute as to Wyeth's ongoing obligations.

The Borough also argues that Unruh's testimony is supported by documentary evidence. Unruh's August 8, 1980, letter to Mr. Harold Loughhead of Wyeth included a provision entitled "Minimum charge for availability of treatment whether or not industry is using system." R.R. 481a. At trial, Unruh was asked why that language was included in his letter to Wyeth:

> Q.  And why is that language included in your outline, sir?
>
> A.  Because that was a significant point with the Borough of West Chester. There was a concern that if this plant was

18

designed for Wyeth, who would be the major user, not only in terms of quantity but quality of waste, that there would be certain fixed O&M costs which would be there regardless of whether Wyeth Laboratory's manufacturing was still there. *So the concern raised by the engineers was to protect the Borough so they wouldn't be holding the bag in terms of a monthly/yearly costs*, that Wyeth would have to agree that they would pay certain fixed costs whether they were operating their facility or not.

R.R. 481a (emphasis added). Unruh went on to explain that the Borough was concerned that Wyeth would seek to avoid its obligations under the Agreement by selling the facility.

Wyeth responds that there was no "bag" for the Borough to hold as of 2006. It denies that the Agreement is ambiguous, a point agreed to by the Borough. Notably, the extrinsic evidence was not relied upon by the trial court. The Borough's extrinsic evidence may have shown that Wyeth could not abandon its obligations under the Agreement by selling the property, but that did not happen. In any case, the Borough's extrinsic evidence did not establish a perpetual duration to the Agreement.

### d. Conclusion

The extrinsic evidence is conflicting, but it is not necessary to resolve that conflict. We agree with the parties that the Agreement is not ambiguous. Its meaning can be determined by application of common law contract principles to the actual language of the Agreement.

We conclude that the trial court erred in its construction of the Agreement. It gave no effect to the Background Clause and erred in holding that the recording of the Agreement established a perpetual duration. Such a duration requires express language in the contract. *Hutchinson*, 519 A.2d at 390 n.5. No such expression was made in the Agreement.

19

We conclude that the Agreement had a reasonable, not infinite, duration. As such, it was terminable at will by either party once Wyeth paid for its share of the capital costs and for its share of the operating and maintenance expenses incurred at the Goose Creek Plant that were "attributable to the treatment of [Wyeth's] waste." Wyeth argues that the Agreement terminated in 2006 when it stopped using the Goose Creek Plant. We hold, however, that termination of the Agreement required notice. This is consistent with *Price v. Confair*, 79 A.2d at 226, where the contract found to be terminable at will did not terminate until one party notified the other that the termination right was being exercised. Wyeth's notice to the Borough effected a termination of the Agreement on December 31, 2011.[10]

## II. Excessive Charges

Although the trial court acknowledged that "some of the Borough's charges were not support[ed] by the contract," it did not identify those overcharges or address Wyeth's evidence thereon. Trial Court 1925(a) op. at 9. Wyeth's essential complaint was that the Borough used "Wyeth as the Borough's own personal piggy bank" to operate other departments of the Borough. Wyeth Brief at 35.

The terms of the Agreement required Wyeth to "pay its share of Operating and Maintenance Expenses of the Sewage Treatment Facilities." Agreement, ¶8. Operating and Maintenance Expenses are defined as "all expenses

---

[10] This termination date of December 31, 2011, disposes of the Borough's counter-claim for damages arising from Wyeth's non-payment of the 2012 and 2013 invoices. The Agreement was no longer in effect when the Borough sent those invoices. Accordingly, we need not consider Wyeth's challenges to the trial court's award and calculation of damages on the counter-claim.

*required* in operating and maintaining the Sewer System or the Sewage Treatment Facilities."[11]  R.R. 990a (emphasis added).  "Sewage Treatment Facilities" are defined as "the treatment facilities to be constructed at the site of the current Goose Creek waste water treatment plant."  R.R. 992a.

Instead, Wyeth was charged for providing fire protection to Borough residents, purchasing gasoline for police cruisers, paying the salary of the Borough's information technology director, and (as of 2012) replacing the HVAC system in the municipal building, which is not where the Sewer Department is even located.

Wyeth also showed that the labor charges portion of the fixed costs included four wastewater pumping stations located in the Borough that never served Wyeth's waste stream and are entirely unrelated to operation of the Goose Creek Plant.  R.R. 270a-271a.  Additionally, Wyeth presented evidence that the Borough has overstaffed the Goose Creek Plant, and the labor charges included personnel costs for two employees who were not needed to operate the Plant.  R.R. 364a-365a.

The Borough responds that Paragraph 8 states that fixed costs include "sums payable to any person, which sums, under generally acceptable accounting or engineering practice constitute expenses of operation and maintenance."  R.R. 2057a.  This necessarily includes a charge for services provided by the Borough, such as fire and police protection.  The cost of these services are apportioned by

---

[11] Although the definition of Operating and Maintenance Expenses includes expenses attributable to the sewer system as a whole, Paragraph 8 of the Agreement provides that the Borough may only bill for the Operating and Maintenance Expenses associated with the Goose Creek Plant.  R.R. 998a, ¶8.

comparing the Sewer Department's revenue to the General Fund to develop a ratio that is used to apportion overhead expenses among Borough departments.

As noted, the Agreement defines "Operating and Maintenance Expenses" to mean "all expenses required in operating and maintaining" the Goose Creek Plant. Agreement at 7; R.R. 990a. The Borough argues that Wyeth ignores the list of potential types of costs in Sections B through D of this definition, which include labor, repair, administration, supervision, engineering and taxes. R.R. 991a. However, these sections do not modify the limitation that any such expenses must be "*required* in operating and maintaining ... the Sewage Treatment Facilities." Agreement at 7; R.R. 990a. Wyeth argues that salaries of the fire department, gasoline for the police department, and the $500,000 cost of upgrading the municipal building HVAC system were not *required* to operate and maintain the Goose Creek Plant.

None of this evidence was addressed by the trial court. It acknowledged there were overcharges but then waved the issue aside by concluding that Wyeth voluntarily made payment.[12] This is troublesome for two reasons. First, the voluntary payment issue was raised *sua sponte* by the trial court.[13] Second, Wyeth asserts that its payments were made under a mistake of

---

[12] The trial court also concluded that Wyeth could not make out a case for unjust enrichment because, *inter alia*, the parties had a written agreement. Wyeth's unjust enrichment claim would come into play only if the trial court, or an appellate court, were to conclude that the Agreement terminated in 2006.

[13] The Borough denies that the voluntary payment doctrine was raised *sua sponte* by the trial court, invoking its statement of "New Matter":

> 21. Plaintiff's claim sounding in unjust enrichment is barred by Plaintiff's previous payments, pursuant to the ongoing obligations of the Agreement, through the third quarter of 2011.

**(Footnote continued on the next page . . . )**

22

fact. Wyeth did not know what expenses the Borough had loaded into the fixed costs invoices until it took discovery in this case. Nothing in the record shows that Wyeth knew that the Borough's fixed cost invoices included the labor for the pump stations, plant overstaffing, the components of the administrative transfer, a portion of Borough Wastewater Director Kevin Oakes' salary, or any of the other charges Wyeth claims to be extra-contractual. *See Liss & Marion P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 661 (Pa. 2009) (noting that the voluntary payment doctrine bars recovery only if the plaintiff had "knowledge of all the facts" regarding the applicable charges at the time payment was made). In any case, the voluntary payment theory is not relevant to Wyeth's challenge to the propriety of the 2012 and 2013 bills because it has not paid those invoices.

The trial court erred in its disposition of Wyeth's challenge to the fixed cost invoices sent after 2006. During the time the Agreement was still in effect, *i.e.*, 1984 to 2011, Wyeth did not pay invoices voluntarily. Wyeth did not waive its right to pay only those fixed cost invoices required to operate and maintain the Goose Creek Plant. Accordingly, we will remand the matter to the trial court for specific findings of fact and conclusions of law on Wyeth's allegations that part of the Borough's fixed cost invoices sent to Wyeth were extra-contractual because they exceeded what was required to operate the Goose Creek Plant.

---

**(continued . . . )**
R.R. 59a. This vague New Matter does not refer to the doctrine and it does not respond to Wyeth's breach of contract claim at all. Because the Borough contends that payments were made "pursuant to the ongoing obligations of the Agreement," the payments were not "voluntary." Borough Brief at 51. The Borough never briefed the issue.

**Conclusion**

For all the above-stated reasons, we reverse the trial court's judgment in favor of the Borough's breach of contract claim and against Wyeth's request for a declaratory judgment that the Agreement terminated on December 31, 2011. We remand for further proceedings on Wyeth's claim for breach of contract arising from the alleged over-charges for the fixed cost invoices from 2006 to 2011.

_____
MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wyeth Pharmaceuticals, Inc., a : 
Delaware Corporation, successor : 
to Wyeth Laboratories Inc., a : 
New York Corporation, : 
               Appellant : 
 : 
       v. : No. 2116 C.D. 2014
 : 
Borough of West Chester and : 
Pfizer Inc. : 

# **O R D E R**

AND NOW, this 5th day of November, 2015, the order of July 14, 2014, of the Court of Common Pleas of Chester County is REVERSED, and the matter is REMANDED for further proceedings consistent with the attached opinion.

       Jurisdiction relinquished.

 

_____
MARY HANNAH LEAVITT, Judge